STATE ex Rel. FISHER, Relator, *v.* SCHOOL DISTRICT
No. 1 OF SILVER BOW COUNTY et al., Respondents.

(No. 7,315.)

(Submitted June 18, 1934.   Decided June 29, 1934.)

[34 Pac. (2d) 522.]

*Mr. Miles J. Cavanaugh* and *Mr. J. A. Poore,* for Relator, submitted a brief; *Mr. Cavanaugh* argued the cause orally.

*Mr. H. J. Freebourn* and *Mr. Clarence Hanley,* for Respondents, submitted a brief; *Mr. Hanley* argued the cause orally.

*Mr. T. J. Davis, Amicus Curiae,* submitted a brief and argued the cause orally.

MR. JUSTICE STEWART delivered the opinion of the court.

This is an original proceeding instituted in this court by the state of Montana on the relation of H. E. Fisher, a taxpayer, against School District No. 1 of Silver Bow county, and the board of trustees thereof. Relator asks for an injunction to restrain and forbid the consummation of a contract between the district and the government of the United States, and to prevent the issuance of $620,000 of the bonds of the district, the purpose and intention of the district being to obtain from the government under the National Industrial Recovery Act (48 Stat. 195) a total of $800,000, the balance, in addition to the amount of the bonds, to be $180,000 in the nature of a grant under the terms of the Act.

The important facts are as follows: After the enactment, by the Congress of the United States, of the National Recovery and other kindred Acts, particularly H. R. 5755 (48 Stat. 195), and in the month of September, 1933, the school board declared its intention to take advantage of that Act, and prepared an application to the public works administration board appointed for the state of Montana, and applied for a loan of $800,000 for the purpose of building a high school. The application was approved by the board of public works in Montana and referred to the Public Works Administration at Washington, D. C., where it was also approved. Appropriate petitions were filed at proper times to justify the continued action of the school board in the matter of the submission of the proposal to the voters of the district. About December 12, 1933, there was presented to the board a petition asking that an election be held on the question of issuing bonds of the district in the sum of $800,000; the petition was

signed by not less than 20 per cent. of the qualified and registered electors who resided within the district, who paid taxes upon property therein, and whose names appeared on the last complete assessment-roll for state, county, and school district taxes. The petition was duly certified by the county clerk, in accordance with the statute.

On February 3, 1934, by resolution of the board, an election was held, and the following question was submitted on the ballot, to-wit: "Shall the board of trustees of School District No. 1 of Silver Bow county be authorized to borrow from the Government of the United States or its agents the sum of $800,000 or so much thereof as is necessary, and issue, negotiate, and sell bonds of this school district in the amount of $800,000 bearing interest at the rate of not to exceed 4 per cent. per annum, payable semi-annually during the period of twenty years redeemable at any time after five years, for the purpose of erecting and equipping a new high-school building in said district?"

There was also submitted at the same time another ballot carrying the following wording: "Separate School Ballot for those who wish to express their choice of site for the new High School. Instruction to Voter: No one may vote whose name is not on the precinct register as a taxpayer within the District. Your choice depends on whether a suitable site can be secured for the new High School without cost to the District. Place X in space before your choice.

"For Central Site—Bounded by Porphyry, Main, Gold and Wyoming Streets.

"For South Side Site."

No list of qualified voters was printed or posted. Upon a canvass of the vote it was ascertained that 3,102 voters had voted for the issuance of the bonds and 2,015 had voted against the bonds. On the question of the site it was ascertained that 1,983 voters had voted for the central site, and 2,206 had voted for the south side site.

The board declared the election carried in so far as the bonds were concerned, but made an entry in its minutes to

the effect that the issue on the site had been submitted subject to the requirement of a free site on the south side, and that by reason of a misunderstanding such site was not available. It thereupon made an order selecting the central site as the site for the new high school.

Later the board rescinded its action in selecting the central site and adopted a resolution submitting the matter of a site to the electors at the general election to be held for the election of school trustees on April 7, 1934. Several sites were nominated, but the board submitted two of them, which were designated as the central site and the Whittier site. At the election on April 7, 5,911 votes were cast for the central site, and 3,808 for the Whittier site. Thereupon the board proceeded to select the central site as the one upon which the high school should be located.

No separate election was ever ordered or held on the question of the building of the high school. The only questions submitted at any election were those hereinbefore indicated.

The petition of the relator praying for a writ of injunction recites all the proceedings of the board in connection with the whole matter, and assails the validity of the same on nine grounds, which, briefly stated, are as follows: (1) That the election of February 3 was illegal, because no lists of the names of the persons qualified to vote were printed or published; (2) that the election was illegal, because no persons except taxpayers were allowed to vote; (3) that the election was illegal and void, for the reason that the electors were fraudulently and unduly influenced to vote in favor of the bonds because of the submission at the same time of the ballot relative to proposed sites; (4) that the election on the issuance of bonds was illegal, because of misrepresentations and false statements of the board members that the vote on the site would be decisive; (5) that the location of the site made on April 7 was illegal, because the board was not directed to locate the site by a majority of the electors, but the site was selected by the board by placing on the ballot only two sites to be voted upon, whereas other sites had been suggested

by petition; (6) that the bond election was illegal, because the question of the necessity of building a new high school or the abandonment of the existing high school was never submitted to the electors at a separate election, and that the board decided that matter without the electors being permitted to have anything to say about it, and that the question finally submitted only allowed taxpaying voters to vote; (7) that the method of selecting the site was void, because the selection was not made by the qualified electors of the district, but by the board of trustees, and that the electors were forced to vote for one of only two sites; (8) that the legislature of Montana at its special session of 1934, in passing House Bill 19, provided for a plan whereby citizens may be taxed on their property without their consent and their property taken without due process of law; (9) that the bond election was not free and open and was in violation of section 5 of Article III of the Montana Constitution.

The respondent district and the trustees thereof filed an answer admitting most of the allegations of the petition. They admitted that no notice of election as provided for in section 10 of Chapter 147 of the Session Laws of 1927 was ever posted or published, except that a copy of the resolution calling for the election was posted in each of the precincts of the district. The answer also admitted that in the election of February 3 a majority of the votes cast were in favor of the south side site, and that the board on February 8 passed a resolution selecting the central site as alleged; denied that the proceedings were illegal and void in any respect; and generally admitted everything but the alleged illegal effect of the proceedings as claimed by relator. It was also admitted that, unless restrained, the board would issue and sell the bonds, build the proposed high school building, and levy and collect the necessary taxes as alleged in the petition.

By stipulation of the parties the complete records of the board of trustees of the school district relating to the whole matter were submitted as the record in this case. This record consists of certified copies of all the minutes and or-

ders of the board, the agreement with the government for the sale and purchase of bonds, the budget application and tax levy, and all petitions filed with or considered by the board in connection with the matter as a whole.

It will then be observed that this court now has before it for its consideration everything connected with the matter of the election for the bond issue, the selection of a site, the contract with the government, and all collateral matters affecting the purpose sought to be accomplished by the school district and the government in the matter of the construction of the new high school building in Butte and the financing thereof. The court has examined all these records, and does not hesitate to say, that they are, generally speaking, in substantial conformity with the laws of the state of Montana applicable thereto. We will not enter into a detailed discussion of all the various steps taken by the district, but will consider only those particular matters having relation to the specific objections made in the petition and discussed in the oral argument of the cause and in the briefs submitted by the parties. All other matters will be considered as regular and as meeting the requirements of the provisions of the law involved in the matter.

It has been suggested that this court has no jurisdiction to hear and determine the present application for a writ of injunction. Section 8807, Revised Codes 1921, provides in part as follows: "No action to obtain an injunction must be commenced in the supreme court, except in cases where the state is a party, or in which the public is interested, or the rights of the public are involved. * * * " This section clearly contemplates that the supreme court shall have jurisdiction in such cases where the interests of the public are involved.

In the case of *State ex rel. Clarke* v. *Moran,* 24 Mont. 433, 63 Pac. 390, it was held that this court has the power to issue the writ of injunction as an original writ in a case wherein public' interests are involved. It was also said in that case that, where public and private rights meet, the fact

that a private right is involved ought not to oust the supreme court of jurisdiction. (See, also, *State ex rel. City of Helena* v. *Helena Waterworks Co.,* 43 Mont. 169, 115 Pac. 200.)

A school district is acting in a governmental capacity in providing a schoolhouse; it is not acting in a private or proprietary capacity. (*Howard* v. *Tacoma School District,* 88 Wash. 167, 152 Pac. 1004, Ann. Cas. 1917D, 792.) The school district is a public corporation. (*Henderson* v. *School District,* 75 Mont. 154, 242 Pac. 979; *State ex rel. School District* v. *Urton,* 76 Mont. 458, 248 Pac. 369; *Finley* v. *School District,* 51 Mont. 411, 153 Pac. 1010.) It is an instrumentality of the state government, and to this extent is part of the state sovereignty created by the Constitution to perform the public function of educating the future citizens of the state and nation. Its influence is public—coextensive with the state, and the interest in its welfare is public. (24 R. C. L. 562; *Freel* v. *School City of Crawfordsville,* 142 Ind. 27, 41 N. E. 312, 37 L. R. A. 301; *Hill* v. *Boston,* 122 Mass. 344, 23 Am. Rep. 333; *Attorney General* v. *Lowrey,* 131 Mich. 639, 92 N. W. 289. Compare *State ex rel. Clarke* v. *Moran,* supra; *State ex rel. Redman* v. *Meyers,* 65 Mont. 124, 210 Pac. 1064, 1065.)

Relator contends that the election held on February 3, 1934, ▮ was illegal and void because no lists of the names of the persons qualified to vote at the election were printed and published as required by our general election laws. It is true that, prior to the enactment of Chapter 24, Extraordinary Session of 1933–1934, it was necessary to print and post or publish lists containing the names of qualified electors. (Sec. 567, Rev. Codes 1921; Chap. 147, Laws of 1927 as amended.) Chapter 24, supra, however, was designed and enacted as emergency legislation for the benefit of the general public, and as such it temporarily suspended many of the requirements of our general election laws. (*Shekelton* v. *Toole County,* ante, p. 213, 33 Pac. (2d) 531.) Paragraph 3 of subdivision (b) of section 5 of the Act provides in part as follows: "Provided that it shall not be necessary for the County Clerk to have the aforesaid lists of registered electors either printed or posted."

Section 7 of the Act provides in part as laws of this state governing the issuance ___ sale of bonds * * * in so far as the same are applicable and not in conflict with any of the provisions of this Act, shall apply to and govern all bonds issued under the provisions of this Act." In conformity with this section it is apparent that the above-quoted portion of section 5 of the Act dispenses with the requirements of the general election laws in the particular mentioned. (*Shekelton* v. *Toole County*, supra.)

Relator argues that, so far as Chapter 24, supra, purports to suspend requirements of the general election laws, it is unconstitutional as special legislation, within the prohibition of section 26, Article V, of the Montana Constitution. Neither the chapter as a whole nor the provision under consideration can be denominated special legislation. The section of the Constitution relied upon to condemn the provision was discussed very fully by this court in the case of *State ex rel. Redman* v. *Meyers,* supra. The following excerpts from the opinion in that case seem to fit the circumstances here and to answer the charge of special legislation: "A special statute is one which relates to particular persons or things of a class, * * * or one made for individual cases and for less than a class, * * * or one which relates and applies to particular members of a class, either particularized by the express terms of the Act or separated by any method of selection from the whole class to which the law might, but for such limitation, be applicable. * * * The test of a special law is the appropriateness of its provisions and the objects that it excludes. It is not, therefore, what a law includes, but what it excludes, that determines whether it is special. * * * The fact that section 1038 applies only to some school districts does not necessarily render it invalid. So-called class legislation may be constitutional if the class is germane to the purpose of the law and is characterized by some special qualities or attributes which reasonably render the legislation necessary, or, in other words, if the classification is reasonable, and the law operates equally upon every person or thing within the given

Interdicted class legislation includes all laws that rest upon some false or deficient classification, and the vice in such laws is that they do not embrace all of the class to which they are naturally related. * * * A fair test for determining whether a statute is special is this: Does it operate equally upon all of a group of objects which, having regard to the purpose of the Legislature, are distinguished by characteristics sufficiently marked and important to make them a class by themselves? * * * Circumstances may arise, however, under which a general statute cannot be made applicable to a given subject, or, if applicable when enacted, it may spend its force with the passing of time and cease to be adequate for the purpose intended. If the applicability of a general law depends upon extrinsic facts and circumstances, the question of applicability is referable to the Legislature, and with its determination the courts will not interfere."

What we said in *Shekelton* v. *Toole County,* supra, relative to the applicability of general laws in the face of the emergency Act, is in point here. There we held that general laws applied to such matters only in so far as they were applicable. The same is true here, and necessarily so, for the reason that, while Chapter 24 is an emergency Act, it is general in character and scope, and all who may conform and qualify may avail themselves of its favorable provisions and enjoy the relief tendered by the general government to the several states and the legally constituted governmental subdivisions thereof.

Relator contends that the election was illegal because only taxpayers were allowed to vote. He argues that, under the provisions of our general election statutes, the question of building a schoolhouse must be determined by all the voters at an election held for that purpose, as distinguished from the electors who are taxpayers. In support of this position he relies upon Chapter 122, Laws of 1931, and upon Chapter 148, section 83, subdivision 2, Laws of 1931. The latter section provides in part as follows: "The power of the board * * * to build, purchase, or otherwise acquire, a high school building * * * shall be exercised only at the direction of a

majority of the qualified electors * * * of the district * * * voting at an election to be called by the board.''

Chapter 47, Laws of 1929, provides in part as follows: ''That from and after the passage and approval of this Act, only such registered electors of the city, town, school district, or other municipal corporation whose names appear upon the last preceding assessment roll shall be entitled to vote upon any proposal to create or increase any indebtedness of city, town, school district or other municipal corporation, required by law to be submitted to a vote of the electors thereof.'' This section clearly defines ''electors,'' as used in the statutes cited by relator, to mean only those electors whose names appear upon the last assessment-roll—those who are taxpayers. (See *Weber* v. *City of Helena,* 89 Mont. 109, 297 Pac. 455.)

Even if relator's interpretation of the general statutes upon this point (that all the electors were entitled to vote on the proposition) were correct, the validity of the election under consideration here would not be affected thereby. This is because the general statutes are not controlling in the instant case. Section 5 (a) of Chapter 24, supra, provides: ''No lease or contract shall be entered into and no debt or liability shall be incurred or created under the provisions of this Act on the part of any county, city, town, school district, public or municipal corporation, political subdivision or governmental agency, for the payment of any part of which taxes will be levied against the taxable property therein, without the approval of a majority of the qualified electors thereof whose names appear upon the last preceding assessment roll, voting at an election called for such purpose.''

If the provisions of our general election statutes were in conflict with this section, then, in accordance with what we have already said upon this subject, such requirements of the general statutes would not be applicable in the instant case. What we have said with respect to the alleged necessity of posting lists of names of persons qualified to vote is also decisive of the present question. Further discussion and cita-

tion of authorities upon this point are unnecessary. The authorities already cited are applicable and controlling.

Relator complains of the fact that the question of building a new high school was never submitted to the electors at a separate election, and that the question finally submitted (that regarding the issuance of the bonds) only allowed taxpayers to vote. As we have already indicated, only the taxpaying voters were properly entitled to vote upon the question of issuing the bonds. It may be true that ordinarily there should be a separate election at which all electors may have an opportunity to say whether a new school building should be erected. It is not necessary, however, for the disposition of this case to lay down any broad or general rule upon the question. We are satisfied that under the circumstances of the instant case as presented in the record the failure to hold such separate election did not in this matter invalidate the proceedings. The authority given by a majority of the electors voting at the election of February 3, 1934, to issue bonds for the purpose of building a schoolhouse necessarily carried with it the authority and direction to build the new schoolhouse. (*Krogh* v. *Danielson,* 73 Colo. 135, 213 Pac. 996, 997.) In the last-cited case the Colorado court, dealing with a question almost identical with that presented here, said: "The vote of the electors, instructing the directors of the district to issue bonds for building a school house necessarily involved, as a part of the authority conferred, power to build the school house."

But there is nothing in the record to indicate that the result of the election held February 3, 1934, would have been different even if nontaxpaying electors had been allowed to vote. From all that appears we conclude that a majority of the qualified electors did vote in favor of issuing the bonds, and the authority to issue the bonds necessarily implied and carried with it the authority to build a new schoolhouse.

Relator contends that the method of selecting the site was void because the selection was not made by the qualified electors of the district, but by the board of trustees. He

argues that the board was not directed in this matter by a majority of the electors, but that the site was selected by placing on the ballot only two sites to be voted upon, whereas other sites had been suggested by petitions. There is no merit in the contention. School district No. 1, of Silver Bow county, is a district of the first class. Much discussion of the rights of the board under the provisions of sections 1014 and 1015, Revised Codes 1921, as amended, occurs in the opinion in the case of *Nichols* v. *School District*, 87 Mont. 181, 287 Pac. 624. A consideration of the sections in the light of what is said in previous opinions of the court and of the facts in the instant case leads us to the conclusion that no error is properly predicable upon the procedure adopted and finally followed in this matter. It must be borne in mind that the board did finally submit the matter of two sites, then owned by the district, to the electors at a regular election, and that a majority of the electors voting at such election did vote in favor of the central site, the one finally selected. In view of that fact it is not necessary to again consider the independent right of the board to select a site. As the matter stands before us, a site was selected by the board, and also duly selected by a majority of the qualified electors of the district. (Compare *Reid* v. *Lincoln County*, 46 Mont. 31, 125 Pac. 429.) The author of this opinion believes that the power to select the site in this instance did reside in the board, notwithstanding what was said in the case of *Nichols* v. *School District*, supra.

It will be observed that the site matter was submitted at the first election on a separate ballot and in a qualified manner. The ballot bore printed matter containing the following: "Your choice depends on whether a suitable site can be secured for the New High School without cost to the district." What was the effect of so submitting the matter of the site at all? Did the submission of the question constitute fraudulent misrepresentations to the voters? We do not see how it could have done so. There is nothing in the record before us to support the allegation that anyone was influenced to vote for the bonds

by reason of the site matter. There is not a thing to show that the vote on the bonds would have been different if the site matter had not been submitted at all. There is no evidence that the submission of that subject even in the qualified manner affected the result. The language of the district court of appeals of California in *Jennings* v. *Clearwater School District,* 65 Cal. App. 102, 223 Pac. 84, 86, is peculiarly applicable here. That court considered a similar matter and said: "This proposition is not worthy of serious consideration." So we say here that there is nothing in the whole record to support the charge of fraud or that false representations were employed by the board.

After a careful consideration of the record in this case, we are convinced that the proceedings of the school district, while somewhat irregular, were in substantial accordance with law.

The writ is denied and the proceeding dismissed.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES ANGSTMAN, MATTHEWS and ANDERSON concur.