[File No. 7309]

LYLE ANDERSON, J. J. Johnson, E. C. Glass, Ed McIntyre and Vernon Hancock, for themselves and for all others similarly situated, including property owners, residents, electors, and school patrons of Wheatfield School District No. 52, Respondents, v. P. W. PETERSON, Eric Sand, George Eccles, Oswald Braaten and Mrs. J. W. Bjerklie, constituting the Grand Forks County, North Dakota reorganizing committee under the act known as an "Act to Provide for Reorganization of School Districts", Florence Rasmusson, the duly qualified County Superintendent of Schools of Grand Forks County, North Dakota, and ex-officio Secretary of the above committee, Hulbert Casement, George Berntson, Mrs. H. J. Gallagher, H. H. Hewitt and Norman Bjorneby, constituting the Walsh County, North Dakota reorganization committee under the act known as an "Act to Provide for Reorganization of School Districts", A. G. Strand, the duly qualified County Superintendent of Schools of Walsh County, North Dakota, and ex-officio secretary of the above committee, S. E. Helpern, C. C. Swain, M. F. Peterson, Mrs. O. H. Nelson, Harley E. Swenson, A. C. Van Wyk and A. H. White, constituting the state reorganization committee under the statute entitled "An Act to Provide for Reorganization of School Districts" and Mary A. Kelsh, the Secretary

and executive director of said State Reorganization Committee, Appellants.

(54 NW2d 542)

Opinion filed July 11, 1952

*Robert A. Alphson,* for appellants.

*Lyche & Lyche,* for respondents.

*Roy K. Redetzke* and *Ralph F. Croal,* Amici Curiae.

GRIMSON, J. This is a suit brought by the plaintiffs as property owners, electors, school patrons, and taxpayers of Wheatfield School District No. 52, Grand Forks County, North Dakota, against the County Superintendents of Schools of Grand Forks and Walsh counties, and the state committee and the county

committees of Grand Forks and Walsh Counties for reorganization of school districts under the "Act to provide for the reorganization of school districts", Chapter 15–53, 1949 Supplement, NDRC 1943. The plaintiffs allege many irregularities in the reorganization of Inkster School District lying in Grand Forks and Walsh Counties, particularly the inclusion therein of Wheatfield School District No. 52. They also allege that the law is unconstitutional. They pray that all proceedings leading up to said reorganization be declared null and void, and that the defendant be enjoined from proceeding further with said reorganization.

The defendants deny all irregularities and claim that all acts in connection with this special school reorganization were done pursuant to the Reorganization Act, which they claim is constitutional and pray for a dismissal of the action.

At the commencement of the action an application was duly made for an injunction to restrain the defendants from holding a special election and from proceeding any further with the formation of the new school district. Upon the hearing on an order to show cause an injunction was granted restraining the defendants from doing any act in furtherance of the reorganization except the holding of the election and, in the event of the results of the election being favorable to the reorganization, the holding of an election of school district officers for the district. The election was held and the reorganization approved but all matters since then have been held in abeyance.

Upon a hearing of the matter on its merits the district court found for the plaintiffs, declared the proceedings void and enjoined any further action in connection therewith.

Thereupon the defendants took an appeal from the judgment and the whole thereof. They assigned as errors:

"1. That the District Court erred in holding that the various steps, proceedings and acts taken by the defendants, their agents, servants and others acting with and for them in the proposed reorganization, including the plan Wheatfield School District No. 52, including the entire proposed Inkster reorganization plan, the approval thereof, that the calling of the election, certification and recording of the results thereof and all other acts in

that connection, done and performed, are in all things null and void, and of no force and effect, and that all such acts, steps and proceedings be quashed, dissolved and dismissed.

"2. That the Court erred in holding as a matter of law that the plaintiffs are entitled to a Judgment and Decree permanently restraining and enjoining the defendants and each of them and their agents, appointees and servants and all persons acting for or in concert with them, from doing any act in furtherance of the reorganization and formation of the proposed Inkster School District and from conducting any business by or in behalf of the said proposed Inkster School District.

"3. That the Court erred in finding as a fact that the County Committees of Grand Forks County and Walsh County have not held and conducted informative and explanatory meetings; that the District Court erred in holding that exact compliance with Section 15–5310 of the 1949 Supplement to the North Dakota Revised Code of 1943 was mandatory upon the County Committees and failure to hold such public hearings pursuant to notice, leaves the County Committees without authority to proceed with the organization of the proposed new district."

Upon this appeal and these specifications the alleged errors in the whole proceeding and the constitutionality of the law were briefed and argued by both sides and placed before this court for decision. The matters raised are important and of public concern. They affect the reorganization of school districts under the new Reorganization Act. Several such districts have been or are about to be reorganized. A decision on these matters now is urgent.

The plaintiffs list their objections to the procedure under sixteen points as follows:

"1. No meetings with notice were had prior to preparing the plan as required by Section 15–5310, 1949 Supplement.

"2. No comprehensive study was made within such months as required by Section 15–5311 1949 Supplement.

"3. There was no public hearing on the proposal after the notice for the April 9, 1951 meeting including District No. 73, and thus set forth a different territory than is included in the

proposal involved. Thus no hearing on proposal as required by Section 15–5313 of the 1949 Supplement was held.

"4. The comprehensive plan was not timely submitted and not given timely attention as required by Section 15–5314 1949 Supplement.

"5. There was no joint committee action as required by Section 15–5315.

"6. The proposal was submitted after the comprehensive plan was filed and did not fit into it, contrary to the requirements of Section 15–5316 1949 Supplement.

"7. The election was called before receipt of the approval of the plan from the State Committee, contrary to Section 15–5318 of the 1949 Supplement.

"8. Notice of the election was not posted at *each school house door* as required by Section 15–5318 of the 1949 Supplement.

"9. The notice did not state that the election was being called for the purpose of affording the voters an opportunity to approve or reject the plan as required by Section 15–5318, 1949 Supplement.

"10. The plan says 'all of' in describing an entire school district in the proposal, but the notice of election omits 'all of' contrary to the requirements of Paragraph 30 of Section 15–5318, 1949 Supplement.

"11. The State Committee made no findings and conclusions, and failed to submit any to the County Committee of the approved plan as provided in Paragraph 6 of Section 15–5317, 1949 Supplement.

"12. The Committee did not keep proper records as required by Section 15–5313 Supplement of 1949.

"13. The Grand Forks County Committee violated the policy they had previously adopted and the proposal violated the public policy as set forth in the 1949 Amendment, Senate Bill 106, Chapter 146 of the Laws of North Dakota for 1951.

"14. That the action of the Committee was arbitrary, discriminatory, unreasonable, unfair, capricious and even fraudulent.

"15. The Statute, Chapter 15–53 of the 1949 Supplement the Reorganization Law is unconstitutional.

"16. The Judgment of the District Court is correct and for the foregoing reasons must be upheld."

Chapter 15–53, providing for the reorganization of school districts, was enacted by the 1947 Session of the Legislature, Chapter 147 Session Laws 1947.

The declared purpose of the act was "the formation of new school districts and the alteration of the boundaries of established school districts in order to provide a more nearly equalized educational opportunity for pupils of the common schools, a higher degree of uniformity of school tax rate among districts, and a wiser use of public funds expended for the support of common school system." The law provides that such reorganization could include the formation of new school districts by the alteration of the boundaries of established school districts and a dissolution or disorganization of established school districts. This might be done by uniting two or more established districts or transferring to an established district a part or all of another established district. The law provides for the selection of state and county committees to administer the law. The county superintendent shall be the secretary of the county committee.

The state committee then shall call the meetings of the different county committees as in its discretion may be necessary, to counsel and advise the county committees on the provisions of the act and other matters affecting the determination of proper district boundaries.

The county committee prior to formulating any plan for the reorganization of school districts shall conduct such hearings, hold such meetings throughout the county as it may deem necessary to explain the provisions of the act. The county committee shall within nine months, after its organization make a comprehensive study of the school system and prepare a plan for the reorganization of the school districts. It shall give due consideration to the valuation, the size, the geographical features and the boundaries of the district; to the number of pupils attending school; to the population; to the location and condition of school buildings and their accessibility to the roads to the school; to the welfare of teachers and pupils; to the boundaries

of other governmental units and the location of private organizations; to the educational needs of local communities; to economies in transportation and in administration costs; to the further use of existing satisfactory school buildings, sites and playfields; to reduction in disparities in per pupil valuation among school districts; to the equalization of the educational opportunity of pupils, and to any other matters which in its judgment are of importance. The county committees shall determine the value of the property, consider the amount of outstanding indebtedness and make an equitable adjustment on all property among the districts involved.

The county committee shall hold public hearings on the advisability of any plan for the reorganization of the school districts, and the property adjustment proposed. At that time the committee shall hear the testimony of any person or school district interested in the advisability of the plan or in the adjustment of the school property between the districts involved. The county committee then decides upon the plan and, if approved, upon the adjustment of the property. The reorganization plan shall be submitted to the state committee together with the reasons for it and the recommendations and findings of the county committee.

If the plan involves school districts lying in two or more counties it shall be submitted to a special committee composed of not less than three members of the county committee of each county involved. The plans for the reorganization of one or more school districts may be made without awaiting the completion of a comprehensive plan for the county.

If the state board approves the plan the county superintendent shall call a special election at which election the incorporated villages and cities shall vote as a unit and all rural territory within the proposed district shall vote as a separate unit. The election notices shall clearly state that the purpose of the election is to afford the voters an opportunity to approve or reject the proposal. If a majority of all votes cast by the electors residing in a rural area and a majority of all votes cast by the electors in the village or city area are both in favor of the formation of the district the county superintendent shall make the proper

959

adjustment of the property, assets, debts and liabilities as provided in such plan and shall organize and establish such district. If the proposal is rejected the county committee may make a revision of the plan and if that is approved by the state committee a new election may be called.

Then the act provides for election of a new school board. The directors may be distributed geographically over the new district. Each common school in the old district located in the reorganized district shall be kept in session unless people of that old district by majority vote or by a petition signed by two-thirds of the electors in the old district where the school is located shall approve of its discontinuance. The act further provides that the school board shall open any closed school upon the written demand of the parents or guardians of six or more children of compulsory school age residing within 2½ miles of the school. The boundaries of the new district shall not be altered within five years except upon recommendation of the county superintendent and approval by the county and state committee. Provision is made for an appeal to the district court on any question of adjustment of property, debts and liabilities among the districts involved. The law prescribes further details for carrying out its purpose.

The plaintiffs claim that this Reorganization Act is unconstitutional. They say that it is an unlawful delegation of legislative power to the county committees contrary to section 25 of the Constitution, which vests the legislative power in the legislative assembly and in the people through the initiative and referendum.

In considering the constitutionality of an act every reasonable presumption in favor of its constitutionality prevails. See Wilder v. Murphy, 56 ND 436, 440, 218 NW 156 and cases cited. This court has repeatedly held that the legislative power cannot be delegated. State ex rel. Rusk v. Budge, 14 ND 532, 105 NW 724; State ex rel. Miller v. Taylor, 27 ND 77, 145 NW 425; State ex rel. City of Fargo v. Wetz, 40 ND 299, 5 ALR 731, 168 NW 835. It must clearly appear, however, that the power attempted to be delegated is legislative. Wilder v. Murphy, supra.

The legislature "may confer discretion in the administration

of the law, and the constitution has never been regarded as denying to the legislature the necessary resources of flexibility and practicality which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the legislature is to apply, and the legislature may make a law to delegate a power to determine some fact or state of things upon which the law makes or intends to make its own action depend. The true distinction is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law; the first cannot be done, to the latter no valid objection can be made." 16 CJS Constitutional Law, sec. 133, pp 340–341.

The synopsis of the Reorganization Act heretofore set forth shows that the legislature reorganized school districts upon the existence of certain facts. It laid down the policies and established the standards for such reorganization of school districts. It created the agency to find the facts and to administer the plan under the provisions of the law. Such agency, the county committee, was chosen by representatives of the school districts. Public hearings were provided to ascertain the facts required for the organization of any proposed reorganization of school districts and to determine the advisability of the reorganization. Any reorganization plan is subject to the approval of the state committee. Then the plan is finally submitted to the electors of the district. An appeal to a district court on any question of adjustment of the property, debts, and liabilities among the districts is provided. Transportation, if included in the plan, is made compulsory. Provision is made for keeping open the common schools in the old districts if desired. Public hearings and an election on any proposed reorganization plan are provided, before the law establishing the reorganization district takes effect. The act outlines the procedure in detail. The committees are not empowered to make any law. They are only empowered to find the facts and circumstances upon which

the reorganization provided by the law is accomplished. In that connection the law makes careful provision to the end that the principles of local self-government are minutely observed. Clearly the act to provide for the reorganization of school district delegates only administrative power to the committees.

"The legislature may delegate to an executive agency discretion in the administration of school affairs. Thus, the legislature may empower, or particular statutes have been held not invalid which empower, an executive agency to create, alter, or abolish, or to approve or recommend the creation or alteration of, districts for educational purposes." 16 CJS Constitutional Law, sec 138 (23) p 383. See also Anno 65 ALR 1524.

The State of Washington has a reorganization statute very similar to our Chapter 15-53 1949 Supplement to NDRC 1943, entitled: "An Act relating to education; defining terms; providing for county committees and a state committee for the reorganization of school districts; defining the powers and duties of the county committees and the state committee prescribing duties of county and state officers; providing for boards of school directors in reorganized school districts; providing for appeals; providing for the classification of reorganized school districts and making an appropriation." Rem Supp 1941, Sec 4709-1 et seq. The Supreme Court of Washington in the case of Wheeler School District v. Hawley, 18 Wash2d 37, 137 P2d 1010, 1015, says:

"Nor do we find any unlawful delegation of legislative power. The act sets up the machinery and fixes the standards by which the county committee and the state committee shall be controlled. It commits no legislative power to them. It simply entrusts to them the administration of the act. Newman v. Schlarb, 184 Wash 147, 50 P2d 36; State v. Auer, 197 Wis 284, 221 NW 860, 223 NW 123; Dowell v. Board of Education, 91 P2d 771; People v. Camargo Community Consol. School Dist., 313 Ill 321, 14 NE 153; People ex rel. Board of Education v. Board of Education, 381 Ill 311, 43 NE2d 1012; Gardner v. Ginther, 232 App Div 296, 250 NYS 176; State v. Lamont, 105 Kan 134, 181 P 617. See also: State ex rel. Washington Toll Bridge Authority v.

Yelle, 195 Wash 636, 82 P2d 120; Carstens v. DeSellem, 82 Wash 643, 144 P 934."

In State v. Auer, 197 Wis 284, 221 NW 860, it is held:

"A law otherwise unobjectionable is not invalid simply because power is given to some local officials or body of electors to determine the existence of a fact upon which it shall go into effect in the given locality, if the law itself is a complete law upon the statute books. This is not the delegation of power to make a law, but simply the delegation of power to determine or ascertain some fact upon which the action of the law which is complete in itself is to depend. Adams v. Beloit, 105 Wis 363, 368, 369, 81 NW 869, 870 (47 LRA 441)."

"This rule 'is grounded upon the proposition that the act was a completed piece of legislation when passed by the Legislature and was a complete law when signed by the Governor, but nevertheless a law which would not become operative unless a future contingency happened, to wit, that it received the sanction of a majority of the popular vote." State ex rel. Van Alstine v. Frear, 142 Wis 320, 328, 125 NW 961, 964 (20 Ann Cas 633).

In State v. Gallatin County High School District (1938) 102 Mont 356, 58 P2d 264, 266 in which an act providing for the creation of high school districts was attacked as unconstitutional, the court said: "While the legislature may create and abolish school districts and change the boundaries thereof, such action is usually provided for by general laws in which the Legislature formulated the policy broadly, leaving the working out of the details to designated officers. Such provisions . . . do not violate the provision against delegating legislative power to administrative officers. See State ex rel. City of Missoula v. Holmes, 100 Mont 256, 47 P2d 624, 628, 100 ALR 581; Pierson v. Hendricksen, 98 Mont 244, 38 P2d 991; Chicago, M. & St. P. Ry. Co. v. Board of Railroad Commissioners, 76 Mont 305, 247 P 162."

The legislature did not delegate any legislative power to the state or county committees in the Reorganization Act.

Plaintiffs also claim that this Reorganization Act is a local or special law contrary to the provisions of section 69 of the

Constitution which provision prohibits special laws "Providing for the management of the common schools" and section 70, providing that: "Where a general law can be made applicable, no special law shall be enacted."

"A special law is one which relates to particular persons or things . . . or which operates on or over a portion of class instead of all of the class." "It has been said that the test of whether or not the law is special is to be found in what it excludes from its operation." 59 CJ sec 322, p 735. "The test of a special law is the appropriateness of its provisions to the objects that it excludes. It is not, therefore, what a law includes, but what it excludes, that determines whether it is special." State v. School District No. 1. Silverbow County, 97 Mont 358, 34 P2d 522; see also, State ex rel. Bray v. Long, 21 Mont 26, 52 P 645.

The Reorganization Act applies to all school districts wishing to reorganize under its provision without any discrimination. There are no exclusions from its provisions. It is a general law of uniform operation as provided by section 11 of the Constitution.

Plaintiffs claim that section 15–5326, 1949 Supplement NDRC 1943, providing that the boundaries of the reorganized territory may not be changed within five years except upon special consent makes the law special in that there is no such provision in general school law applying to school districts not reorganized. It does, however, apply to all reorganized school districts under this act. There is no exclusion in the class to which it applies. Further, they claim that the provision in the law for the state committee to go out of existence within a limited time makes it a special law. Within that time all school districts so desiring could reorganize. Furthermore, within that time the life of that committee has been extended without any limitation, Chapter 142, SL 1951. See People v. Wright, 70 Ill 388; Wheeler School District v. Hawley, supra.

The final objection as to constitutionality raised by the plaintiffs is that the Reorganization Act deprives them of property without due process of law.

Section 148 of the Constitution provides that: "The legis-

lative assembly shall provide at their first session after the adoption of this constitution, for a uniform system of free public schools throughout the state, beginning with the primary and extending through all grades up to and including the normal and collegiate course."

Section 151 of the Constitution provides further: "The legislative assembly shall take such other steps as may be necessary to prevent illiteracy, secure a reasonable degree of uniformity in course of study, and to promote industrial, scientific, and agricultural improvements."

Thus the legislature is given the power to establish a complete and efficient system for education of the youth of the state. It is not limited in that power by any action or desire of the different communities of the state. It can provide for the boundaries and changes of boundaries of school districts, for the levy of taxes for school purposes and for such other matters as to it seems necessary in order to carry out the provisions of the Constitution.

The inhabitants of a school district have no property rights in the boundaries thereof or in the maintenance of their district. The formation of school districts is entirely within the power of the legislature. Dowell v. Board of Education, 185 Okla 342, 91 P2d 771.

In the case of Antelope Valley Union High School District v. McClellan, 55 Cal App 244, 203 P 147, it is well said: "The establishment of a system of public instruction throughout the state is a governmental function, as to which the state reserves to itself the means of giving it complete effect and full efficiency without regard to the wishes of the people . . . possessing such power to create, alter, or abolish districts the function, governmental in its nature, may be exercised immediately by the Legislature or by subordinate bodies to whom the matter is delegated, subject to such conditions and without notice as it may impose."

In School District No. 3 v. Callahan, 237 Wis 560, 297 NW 407, the court holds: "It is well established that the alteration or abolition of school districts in such manner . . . as the Legislature prescribes is not taking of property nor does it

deprive any person of his property within the meaning of the constitutional inhibitions . . . and that statutes in authorizing such changes in school districts do not deny equal protection of the law or due process of law."

Our conclusion is that the Reorganization Act does not in any way provide for the taking of property without due process of law. We hold that the Reorganization Act is constitutional.

We will next consider the claim of the plaintiffs that no hearings and meetings as contemplated by sec 15-5310, 1949 Supplement NDRC 1943, were held. They claim further that the holding of such meetings on legal notices is jurisdictional and that the failure to hold them renders all the proceedings void. The evidence shows that some informative meetings were held but that notice of such meetings was not given in the manner required by said section which reads as follows:

"Prior to preparing or formulating a plan for the reorganization of school districts as hereinafter provided, each county committee shall conduct such public hearings and hold such public meetings at such specified places throughout the county as it may be deemed necessary to explain and acquaint the people in the various communities with the provisions of this Act (chapter). Notice of any such hearing shall be given by publishing a notice in the official county newspaper at least ten days prior to the date set for such hearing. Such notice shall specify the time, place, and purpose of such meeting."

The question arises whether the holding of such meetings upon published notice is mandatory or merely directory. That requires the construction of that statute.

Section 1-0203 NDRC 1943 provides that: "Words and phrases shall be construed according to the context and the rules of grammar and the approved usage of the language . . . ."

In section 1-0202 NDRC 1943, it is provided that: "Words used in any statute are to be understood in their ordinary sense, unless a contrary intention plainly appears, . . . ."

Finally, section 1-0205 NDRC 1943 provides: "When the wording of a statute is clear and free of all ambiguity, the let-

ter of it is not to be disregarded under the pretext of pursuing its .spirit."

In the case of State ex rel. Linde v. Robinson, 35 ND 417, 160 NW 514, this court laid down some canons of construction. It is there said: " 'In the case of all written laws it is the intent of the lawgiver that is to be enforced, but this intent is to be found in the instrument itself . . . . The whole instrument is to be examined. Every such instrument is adopted as a whole, and a clause which, standing by itself, might seem of doubtful import, may yet be made plain by comparison with other clauses or portions of the same law. It is, therefore, a very proper rule of construction *that the whole is to be examined* with a view to arriving at the true intention of each part. The rule . . . *is that effect is to be given, if possible, to the whole instrument,* and to every section and clause. If different portions seem to conflict, the courts must harmonize them, if practicable, and must lean in favor of a construction which will render every word operative, rather than one which may make some words idle and nugatory.' "

In 50 Am Jur Statutes, sec 32, p 53, it is said: "There are cases in which words of the statute, which are generally regarded as mandatory, are nevertheless given a directory or permissible meaning, in order to give effect to the legislative intent. This is true of the word 'shall'. A legislative intention that the word 'shall' is to be construed as permissive, may appear from the spirit or purpose of the act, or from the connection in which it is used or the relation into which it is put with other parts of the same statute." See also 59 CJ Statutes, sec 635, p 1085.

In 59 CJ Statutes, sec 633, p 1077 it is said: "Generally, statutes, directing the mode of proceeding by public officers, designed to promote method, system, uniformity, and dispatch in such proceeding, will be regarded as directory if a disregard thereof will not injure the rights of parties, and the statute does not declare what result shall follow noncompliance therewith, nor contain negative words importing a prohibition of any other mode of proceeding than that prescribed. Especially is this true where to hold void acts done in violation of the statute would work serious inconvenience, or would cause injustice to per-

sons having no control over those intrusted with the duty enjoined, and at the same time would not promote the main object of the statute. Permissive words in a statute in respect of officers or courts will not be construed as mandatory where such construction would create a new public obligation, and it has been held that even mandatory words or provisions in a statute defining the duties of administrative officers may be construed as directory only, unless something in the body of the statute indicates the contrary."

It is provided in Section 15–5310 1949 Supplement NDRC 1943 that before any plans for reorganization of school districts are. made "each county committee *shall* conduct *such* public hearings and hold *such* public meetings at *such* specified places throughout the county *as it may be deemed necessary* to explain and acquaint the people in the various communities *with the provisions of this act."* Clearly the intent of this provision is to make certain that the people of the community are made acquainted with the provisions of the law. Considering the wording of the sentence as a whole and construing it so as to give effect to every word in its relation to every other part of the sentence, the plain import is that only such hearings or meetings shall be held as to the committee seems necessary to furnish to the people information regarding the law. While the word "shall" is used it must be construed as permissive when the rest of the sentence is considered. The necessity of such meetings would depend on whether such information had already been conveyed to the people by other means. If such information had already been given to the people by other meetings or in other ways, there would be no need for a further meeting to discuss only the law. The object of the statute was attained. The wording of this section is such as to leave with the committee the discretion to determine whether or not the state of public information on the law was such that further meetings were necessary. Clearly that section when construed as a whole is directory and the holding of meetings under that section is discretionary with the committee depending on the state of the public information regarding the law.

The question then arises whether the county committee

abused its discretion in failing to call meetings in the manner provided by Section 15-5310, 1949 Supplement NDRC 1943.

It appears from minutes of the county committee of April 26, 1948, that the committee did plan to hold meetings at different places in the county including Inkster. On March 25, 1949 a meeting was held at Inkster attended by 40 school board members from the area and including two from Wheatfield No. 52. At that meeting the minutes show that the committee members explained the law and answered questions. On April 27, 1949, another meeting was held at Inkster City Hall to which "all patrons were invited". On March 2, 1950, a meeting was called by the people of Inkster to discuss boundaries. On December 6, 1950, the P. T. A. Council of Grand Forks County sponsored a meeting at Inkster attended by about 50 people, some from Wheatfield No. 52. Notice of that meeting had been sent out by the County Superintendent to all school board members. The concluding paragraph of that notice was "This is an informative meeting and we would like to have as many present from your district as possible. Please invite your patrons." On January 11, 1951, another P. T. A. meeting was held at Inkster attended by the chairman and secretary of the county committee and representatives from different districts. At that meeting no one was present from Wheatfield No. 52, but information was there given that the president of the school board of Wheatfield No. 52 was circulating petitions to "go ahead under the old law and to become a part of Inkster."

It is clear that this new law and the reorganization of the school district under it had been a matter of interest and discussion in the Inkster community, including Wheatfield No. 52, for two years. Some of those meetings, at least, discussed the law and were held in substantial compliance with Section 15-5310 Supplement 1949, NDRC 1943. That there was a general knowledge in the neighborhood of the law and the proceedings had under it is shown by the results of the election on the plan finally adopted. At that election 254 votes were cast, while only 100 votes were cast in that approximate area at the 1950 general election. We cannot say that after all these meetings and discussions in the neighborhood the committee abused

its discretion in not holding further hearings under Section 15–5310, 1949 Supplement NDRC 1943, for discussion of the law. They were justified in proceeding with calling a meeting under Section 15–5313, 1949 Supplement NDRC 1943, for a hearing on the proposal for reorganization. That was the important meeting climaxing everything done up to that time. That meeting was called on published notice, as required by Section 15–5313, 1949 Supplement NDRC 1943. At that meeting no complaint was made that the law had not been properly explained prior thereto. The objection was to the plan and the procedure in its formation and adoption.

Under points 13 and 14 plaintiffs claim that the Grand Forks County Committee violated the policy and purpose of the act as well as their own announced policy to the effect that the desires of the community should be ascertained before any action was taken by the committee and that the committee acted arbitrarily and with unreasonable, unfair and capricious discrimination.

The purpose of the Reorganization Act as expressed in Section 15–5301, 1949 Supplement NDRC 1943, has heretofore been quoted. It is entirely for the improvement of the school system. The law wisely provided for consultation with the people of the proposed reorganized district. The committee tried to ascertain the wishes of the patrons of the districts. At the meeting held at Inkster December 6, 1950, a committee of one member from each district was appointed to ascertain the sentiment of each district involved as to the proposed reorganization. Upon the final meeting for the adoption of the plan for which notice had been duly given, held April 9, 1951, eight people from Wheatfield No. 52 attended. Among them were four members of the school board, all the plaintiffs, two of whom were members of the school board, and two others. The committeeman appointed to ascertain the sentiment of the district reported that "The ones I have talked to have been in favor of it." It is clear, however, that there was a division of sentiment in that district and a complaint was made that they had not had sufficient time to consider the matter. The proposal had, however, been discussed in the neighborhood for at least

two years prior thereto. Plaintiffs themselves admitted knowing about it and discussing it with other representatives or taxpayers of the district for more than a year. Nineteen of the twenty-three electors of Wheatfield School District No. 52 voted in the election on the proposed plan, showing an interest in the matter. The law at that time did not require a majority vote for the plan in each separate district, but only a separate majority in the rural and village or city areas.

It also appeared that there had not been any school in Wheatfield School District No. 52 for ten or twelve years. There were only ten children of school age. Six of them were attending school at Inkster, two at Orr, and one at Gilby. The district consisted of twelve sections of land and only eight farm units. State Highway No. 18 ran through the district to Inkster.

The people present from Wheatfield No. 52 were given the opportunity at the April 9 meeting to decide whether they wanted to come in or stay out of the new district. The final oral report to the committee was that "The vote is split enough to warrant us coming in." They did not ask to withdraw from the plan.

At that meeting, District No. 73 decided to withdraw from the plan. The matter was then submitted to a vote whether to proceed with the plan after the elimination of District No. 73, but with Wheatfield No. 52 still in. Thirty-one votes were cast in favor of proceeding and only one against. Those present from Wheatfield No. 52 did not vote against it. Thereupon the committee decided to approve the plan.

After that meeting some protests and a petition were received by the committee. The committee, however, had already taken action on the district at the April 9 meeting regularly called for that purpose and to which the people of Wheatfield School District No. 52 could have come and voted against the plan had they desired. So the committee decided to let the matter stand. The action of the committee cannot be considered arbitrary or discriminatory nor a violation of the policy of the committee or of the law.

Plaintiffs' point 3 is that no public hearing was held on the final plan after Inkster No. 73 was withdrawn. In that they

are mistaken. That was the plan finally accepted after a discussion and vote at the April 9th meeting, as heretofore stated. A plan that is accepted at a legally constituted meeting where full opportunity for discussion is given need not be subjected to another meeting even if the boundaries are changed at that hearing.

In the detailed administration of a law such as the Reorganization Act an honest and substantial compliance therewith is sufficient if there is compliance with its essential requirements and the object of the law is attained. Martien v. Porter, 68 Mont 450, 219 P 817; Fitzgibbons v. Galveston Electric Co., — (Tex Civ App) 136 SW 1186.

That applies to points 2, 4, 5, 6, 11, and 12 of plaintiff's objections. Points 2 and 4 refer to a comprehensive study required by section 15-5311, 1949 Supp NDRC 1943. The evidence shows that such a comprehensive study was made by the County Committee. A fair attempt was made to gather the information required by the statute. A comprehensive plan was submitted to the State Committee, to which no objection was made by that committee. No objection was raised as to the time it was done nor is any prejudice shown resulting from any delay that may have occurred. Point 5 relates to the action of the joint committee. The evidence shows that a joint committee was duly appointed by the County Committees of Grand Forks and Walsh Counties for the consideration of this Inkster plan. That such joint committee did meet and consider the plan and, while the minutes are not definite as to whether they took joint action, it is clear that the Walsh County members of the committee, especially interested in that portion of the plan relating to Walsh County, approved the joining of that portion to the Grand Forks County portion of the district. So did the members from Grand Forks County approve of the including of the Walsh County portion with the Grand Forks County portion of the district. The result was the approval by the joint committee of the plan.

Point 6 is that the Inkster plan did not fit in with the comprehensive plan filed. Section 15-5316 does provide for the reorganization of one or more school districts without waiting for

the completion of the comprehensive plan. The evidence shows that the Grand Forks County plan had not been completed and there is no showing regarding the Walsh County plan. The final approval of a plan for a separate district necessarily contemplates that suitable changes might have to be made in the comprehensive plan finally adopted to make the separate plan an integral part of it.

The plaintiffs' point 11 is the criticism of the state board that it made no findings and conclusions respecting the Inkster plan. It merely endorsed it by writing thereon: "Inkster plan approved by the State Committee." That complies with the statute. It is only when changes are made by the State Committee that special findings by it are necessary. Objection 12 by the plaintiffs is that the County Committee did not keep such a record of the hearings as required by section 15–5313. The evidence shows that the County Committee tried faithfully to keep such a record to the extent of taking down in shorthand and transcribing the substance of what was said at the important meeting of April 9. The main objection by the plaintiffs is to the effect that the record does not always show who made or seconded motions. After all that is not the important thing. The action taken in each such instance is fully shown by the minutes. In all these matters there was substantial compliance with the statute.

Plaintiffs' points 7, 8, 9 and 10 concern the calling of the election. Under point 7 they claim the election was called before receipt of the approval of the Inkster plan by the State Committee. The evidence shows that plan was approved by the State Committee on April 15 without any changes and the County Superintendent was notified by telephone. She then immediately got out the notice. Before the notice was published she received the approved plan. That was sufficient compliance with the statute. Section 15–5318.

Plaintiffs' point 8 is that the notice of election was not posted at each schoolhouse door. The Inkster schoolhouse had more than one door and the notice was posted only on the front door. That is the door which the legislature must have had in mind. The object of posting the notice is to call attention of the public

to the election. That is best done by posting the notice at the front door. That is the door by which the public enters and has the best chance to see the notice.

Under point 9 plaintiffs claim that the election notice is not clear because it is not framed in the exact language of the statute. The statute says that the notice shall clearly state that the election has been called for "the purpose of affording the voters an opportunity to approve or reject a proposal·for the formation of a new school district." The notice says: "That such special school election is for the purpose of approving or rejecting a proposal for the formation of a new, common school ·district . . . ." The only interpretation that can be given to that language is that the voters were to be given an *opportunity* to vote on the proposal as required by the statute.

Another objection to the notice of election is raised in·point 10. In the description of the district, the plan uses the·.words "all of" each district included, while the notice omits the words "all of," stating only the name and number of the district. That is not in any way misleading.

These alleged errors claimed in plaintiffs' points 7 to 10 inclusive regarding the calling of the election are trivial and wholly technical. The defendants have shown a sufficiently strict compliance with the election statute so that the district court would not have been justified in enjoining ·the election before it was held on these grounds. Much less can the election be set aside on such grounds after it has been held. Only substantial compliance with the law is then required. See State v. Langlie, 5 ND 594, p 599, 67 NW 958, 32 LRA 723; Casselton Reporter v. Fargo Forum, 65 ND 681, 261 NW 549; Groom v. Port of Bellingham, 189 Wash 445, 65 P2d 1060; Stroud v. McCallen, 386 Ill 103, 53 NE2d 422; 29 CJS, Elections, Sec 81, p 106; 18 Am Jur, Elections, Sec 110, p 248.

The judgment of the district court is reversed and the case is remanded to the district court with directions to vacate the injunction and dismiss the action.

Morris, C. J., and Christianson, Sathre and Burke, JJ., concur.