Clifford L. LINDBERG, on behalf of himself and all others similarly situated, Plaintiffs and Appellants,

v.

Paul BENSON, as Attorney General of the State of North Dakota, and his successors in office, and S. W. Thompson, as Highway Commissioner of the State of North Dakota, and his successors in office, Defendants and Respondents,

and

Wallace E. Warner, Oscar Zetter, C. P. Larson, Weldon Haugen, Agnes Kjorlie Geelan, George Schonberger, Thomas Snortland, and Joe Gumeringer, Intervenors and Respondents.

No. 7492.

Supreme Court of North Dakota.

April 18, 1955.

Hjellum, Weiss & Nerison, Jamestown, Nilles, Oehlert & Nilles, Fargo, Hyland, Foster & Conmy, Rausch & Chapman, Bismarck, for appellants.

Paul Benson, Atty. Gen., for respondents.

William S. Murray, Bismarck, for intervenors and respondents.

BURKE, Chief Justice.

At the June primary election in 1954, the people of this State, by means of the initiative, enacted a statute limiting the right of members of the Legislative Assembly to contract with the State and its subdivisions. It was entitled an "Anti-Corruption" measure. This statute provides:

"No member of the Legislative Assembly of the State of North Dakota, his spouse, nor a partnership, corporation or association, in which such member or spouse, has an ownership of five percent or more of the assets, shall perform any work, labor or services, or provide any material, supplies or merchandise, for the State of North Dakota, or any of its subdivisions for a consideration in excess of a total of ten thousand ($10,000.00) dollars during any calendar year for such work, labor, services, material, supplies and merchandise.

"Any person violating the provisions of this act shall be deemed guilty of a misdemeanor and shall forfeit any consideration received during, or as a result of, or in connection with the violation of this act."

Plaintiff on behalf of himself and others similarly situated, has challenged the constitutionality of this statute by this action for a declaratory judgment. In his complaint he alleged that he is engaged in business as a general contractor; that as such, he is engaged in performing work for and furnishing materials to the State of North Dakota and many of its political subdivisions; that he expects to continue to perform work for and furnish materials to the State and its subdivisions; that he is a member of the Legislative Assembly of the State of North Dakota; that as a result of the enactment of the "Anti-Corruption Measure" a justiciable controversy has arisen between him and the defendants concerning his right to compensation for work done and materials furnished and his right to continue to perform work for and furnish materials to the State and its subdivisions. He alleged that the "Anti-Corruption Measure" is violative of both the State and Federal Constitutions and asked for a judgment resolving the controversy between the parties by declaring that the measure is unconstitutional and by a construction of the measure which would clarify the position of the parties.

The defendants answered, admitting that a controversy exists between the parties, both as to the construction to be given to the initiated measure and as to its constitutionality and that a declaratory judgment would clarify the rights and status of the parties. They alleged that the measure was in all respects constitutional and asked for judgment to that effect. After a trial of the action in the District Court of Burleigh County, judgment was entered declaring the measure constitutional. Plaintiff has appealed from the judgment and demanded a trial de novo in this court.

The controversy which exists between the parties is threefold; first, whether plaintiff is entitled to compensation for work performed for, and materials furnished to, the State of North Dakota after the effective date of said measure under a contract entered into between the Highway Commissioner and the plaintiff prior to such date; second, whether the ten thousand dollar limit of the value of services and materials, which may be furnished by a member of the Legislative Assembly to the State of North Dakota or its political subdivisions, is the aggregate limit which may be furnished to any one political entity or the aggregate limit which may be furnished to all such entities; and third, whether plaintiff, as a member of the Legislative Assembly may continue to fur-

nish materials and services of a value in excess of ten thousand dollars a year to the State of North Dakota and receive compensation therefor.

■ The first two points in controversy are resolved by a construction of the measure. With respect to the first point, it is clear that the measure must be construed to be prospective in operation and that it cannot apply to services and materials furnished in compliance with a contract entered into before its effective date. It is only where the legislative intent is clearly expressed that a statute will be construed to operate retrospectively. Gimble v. Montana-Dakota Utilities Co., 77 N.D. 581, 44 N.W.2d 198; Great Northern Ry. Co. v. Severson, 78 N.D. 610, 50 N.W.2d 889. Furthermore, to give this statute other than prospective effect would give rise to a very serious doubt as to whether it would violate both State and Federal Constitutions by impairing the obligations of contracts. A construction which will render a statute of doubtful constitutionality will be avoided where reasonably possible. Lapland v. Stearns, N.D., 54 N.W.2d 748; State ex rel. Graham v. Hall, 73 N.D. 428, 15 N.W. 2d 736.

■ As to the second point in controversy, we think the language of the statute is so clear that it leaves no room whatever for any doubt as to its proper construction. This language is:

"No member of the Legislative Assembly * * * shall perform any work * * * or provide any material * * * for the State of North Dakota or any of its subdivisions for a consideration in excess of a total of ten ($10,000.00) dollars during any calendar year."

In the phrase "for the State of North Dakota or any of its subdivisions" the alternative "or" and the indefinite "any" are both used. "Any" means "one indifferently out of a number", Webster's International Dictionary, 2nd ed. The language has exactly the same meaning as if the phrase had read "for the State of North Dakota or any one of its subdivisions." We are clear therefore that the ten thousand dollar limit is the aggregate limit of value of service and materials which may be furnished to any one political entity and not the aggregate limit of value which may be furnished to all such entities.

The third point in controversy requires a consideration of the constitutionality of the initiated measure. Plaintiff alleged and argued that the classifications created by the initiated measure deprived him and others similarly situated of their property without due process of law and deny them equal protection of the laws in violation of Article 14 of the Amendments to the Constitution of the United States and Sections 11 and 13 of the Constitution of North Dakota and that the initiated measure violates Sections 28 and 34 of the Constitution of North Dakota by providing for qualifications, in addition to those fixed by the Constitution, for membership in the Legislative Assembly.

■ The first attack upon the classification is that the naming of members of the Legislative Assembly as a class with which the State and its subdivisions will not do business except in limited amounts is arbitrary and has no reasonable relationship to the purposes for which the initiated measure was enacted. In considering this and the other challenges to the constitutionality of the measure every reasonable presumption in favor of its constitutionality prevails. Anderson v. Peterson, 78 N.D. 949, 54 N.W.2d 542; State ex rel. City of Minot v. Gronna, N.D., 59 N.W.2d 514. The measure was denominated an "anti-corruption" measure. The purpose of the enactment was to extend the ancient common-law rule that no state officer may be interested in any contract which he has a voice in letting (which rule is expressed in many statutes of this state) by providing a more comprehensive legislative rule, founded in public policy, which would take away from legislators as a class any personal incentive to increase their opportunities to make profitable contracts by their

votes in the legislature or to use their influence as legislators in securing contracts or the approval of the work done under them. The members of the Legislative Assembly exercise a high degree of control over the fiscal affairs of the State and its subdivisions. They regulate assessments and tax levy limits. They authorize bond issues and, for the State, they make all appropriations. By enacting this initiated measure the people have attempted to remove from the legislators temptation to venality in the exercise of their legislative functions. Many states have constitutional or legislative provisions which are similar in nature and which have remained in force unchallenged for many years. Section 11, Chapter 121, Revised Statutes of Maine, 1903; Article V, Section 30, Constitution of Montana; Article 3, Section 12, Constitution of South Dakota; Section 365, Revised Statutes of Idaho, 1887; Article 3, Section 16, Constitution of Nebraska; Article IV, Section 15, Constitution of Illinois; Ill.Rev.Statutes 1951, Chapter 127, par. 75. There is thus nothing novel either in a public opinion that the faithful discharge of a legislator's duties may be hindered by a temptation of personal profit, or in the means taken to eliminate at least a part of the temptation. In fact there appears to be a substantial consensus that such legislation is in the interest of the public welfare. Whether such legislation is wise or expedient or whether it will fully accomplish its avowed purpose are not questions for the courts to consider. State ex rel. Linde v. Taylor, 33 N.D. 76, 156 N.W. 561, L.R.A.1918B, 156, Ann.Cas. 1918A, 583.

■ We are satisfied that the enactment of the initiated measure under consideration was not in excess of the legislative power. No individual has a legal right to be selected as a contractor for the state and if a statute barring a class of individuals from an opportunity to contract with the state bears some relation to the public welfare, it does not violate the due process, or equal opportunity clauses of the 14th Amendment to the Constitution of the United States nor like provisions of the Constitution of this State. In Perkins v. Lukens Steel Co., 310 U.S. 113, 127, 60 S.Ct. 869, 876, 84 L.Ed. 1108, 1114, the Supreme Court said:

"Like private individuals and businesses, the Government enjoys the unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases."

In Atkin v. Kansas, 191 U.S. 207, 24 S.Ct. 124, 128, 48 L.Ed. 148, 158, the Supreme Court said:

"* * * no employee is entitled, of absolute right and as a part of his liberty, to perform labor for the state; * * *."

In Tribune Printing & Binding Co. v. Barnes, 7 N.D. 591, 597, 75 N.W. 904, 906, this court said:

"Viewed as a question of principle, we are unable to see why the state is forbidden to do what an individual certainly may do with impunity, viz. elect from whom it will purchase supplies needed in the discharge of its corporate functions."

See also, Ellis v. United States, 206 U.S. 246, 27 S.Ct. 600, 51 L.Ed. 1047; Heim v. McCall, 239 U.S. 175, 36 S.Ct. 78, 60 L.Ed. 206; People v. Crane, 214 N.Y. 154, 108 N.E. 427, L.R.A.1916D, 550, affirmed Crane v. People of State of New York, 239 U.S. 195, 36 S.Ct. 85, 60 L.Ed. 218; In re Opinion of the Justices, 303 Mass. 631, 22 N.E. 2d 49, 123 A.L.R. 199; Shaw v. City Council of Marshalltown, 131 Iowa 128, 104 N.W. 1121, 10 L.R.A.,N.S., 825; City and County of Denver v. Bossie, 83 Colo. 329, 266 P. 214.

■ The classification contained in the initiated measure is also attacked because, it is said, it does not operate equally with respect to all within the named class. This attack is based upon the provision of the measure which permits legislators to furnish services and supplies of a value of less than

$10,000 in any calendar year. The argument is that this provision discriminates against legislator contractors who specialize in construction work which usually or almost always exceeds the $10,000 limit of value. The plaintiff whose specialty is highway work is such a contractor. It is true that "* * * A proper classification for legislative purposes must embrace all who naturally belong to the class * * *." Fountain Park Co. v. Hensler, 199 Ind. 95, 155 N.E. 465, 50 A.L.R. 1518, and "Legislation cannot arbitrarily divide a class into two parts and constitute a different rule of law governing each of the parts", State v. Cullum, 110 Conn. 291, 147 A. 804, 806, but the legislation under consideration does not violate these principles. The class named is a single undivided class. It consists of all members of the Legislature. There is a single rule of law governing the entire class. No member of the class may contract with the state or any of its subdivisions in a sum in excess of $10,000 a year.

 If the setting of this limit at $10,000 would render the measure unconstitutional simply because the type of business some legislators conduct is generally within that limit and that of other legislators is generally beyond it, it would be impossible to find a limit which would be constitutional. Wherever the limit is set, the great majority of the members of the Legislative Assembly will not be inconvenienced by the prohibition in any degree and some of the few whose business will be limited by the measure will be affected in a greater degree than others, depending entirely upon the volume of business, it has been their custom to do with the State and its subdivisions. Where size is a proper index to an evil, a legislature may discriminate between the great and the small. Engel v. O'Malley, 219 U.S. 128, 31 S.Ct. 190, 55 L.Ed. 128; Heath & Milligan Mfg. Co. v. Worst, 207 U.S. 338, 28 S.Ct. 114, 52 L.Ed. 236. In this case size is a proper index. In the ordinary course of events the amount of profit in any transaction is proportionate to the size of the transaction since it is customary for businessmen to compute profits at a certain percentage of the gross. The greater the opportunity for profit, the greater is the temptation to venal acts on the part of the legislators and it was for the people in the exercise of the legislative power, to decide at what particular point the size of a transaction might impair the effectiveness of a legislator's service. Exactly the same principle of law and the same reasoning applies to the provision of the initiated measure which bars a corporation, in which a member of the Legislature owns five percent or more of the assets, from doing business with the State or its subdivisions. It is our view therefore that neither of these classifications violates either the 14th Amendment to the Constitution of the United States or Section 11 of the Constitution of North Dakota.

In this connection we wish to point out that the federal statute which was attacked and held valid in Perkins v. Lukens Steel Co., supra, applied only to manufacturers who had contracts with the U. S. Government in the sum of $10,000 or more. While the opinion in the case does not mention this classification we think there is some significance in the fact that it was not challenged by the Lukens Co. on the ground that it was arbitrary or discriminatory.

The view generally expressed in the decided cases is that the power of the state to choose from whom it will purchase supplies or whom it will employ is entirely unrestricted; that the state has as much freedom as private individuals in selecting those with whom they will do business. This Court said so in Tribune Printing & Binding Co. v. Barnes, supra, and the Supreme Court of the United States said so in Perkins v. Lukens Steel Co., supra. Nevertheless, since we are not unanimously agreed upon this question we have considered the challenged classifications in the light of the rules applicable to the regulation by the state of the business of others a field in which the power of the state is concededly more restricted than it is when dealing with its own affairs and we have come to the conclusion that even when so considered the classifications are neither arbitrary nor discriminatory.

 It is also urged by the plaintiff that the initiated measure violates the Constitu-

tion of North Dakota by providing qualifications for the office of members of the Legislative Assembly in addition to those provided by the Constitution. We see no merit in this contention. The initiated measure does not touch qualification for office at any point. Those who were qualified before its passage are still qualified. It is true that one, whose livelihood is derived chiefly from doing business with the state and its subdivisions, may think twice before he becomes a candidate for the legislature, but the mere fact that a man cannot afford to accept an office is not in any sense a legal disqualification.

Finally, we reach plaintiff's contention that the initiated measure violates Section 43 of the Constitution of North Dakota, this section provides:

"Any member who has a personal or private interest in any measure or bill proposed or pending before the legislative assembly, shall disclose that fact to the house of which he is a member, and shall not vote thereon without the consent of the house."

The argument that the initiated measure violates the foregoing provision of the Constitution seems to be that the Constitution by providing how a legislator shall conduct himself when he has a private or personal interest, grants to all members the right to have personal interests of every nature or description in all matters coming before the legislature until such time as the Constitution is changed. Certainly the provision contains no express grant, and it seems to us that the contention that the construction urged, follows as a necessary implication of the language used, is too far fetched to warrant serious consideration.

The judgment of the District Court is therefore modified to conform to this opinion and the case is remanded to the District Court for the entry of a declaratory judgment, settling the rights and status of the parties hereto.

BURKE, C. J., and MORRIS and SATHRE, JJ., concur.

JOHNSON, Judge (dissenting).

I am unable to agree with the conclusions reached by the majority of this court in the opinion prepared by Chief Justice BURKE. The fundamental basis of disagreement is based on the principles enunciated by the majority of this court in syllabi Nos. 7, 8 and 9.

The facts show that the plaintiff is a general contractor; that he is the owner of twenty per cent of the stock in the Lindberg Construction Company, a corporation; and that his three brothers and sisters own eighty per cent of the stock of this corporation. The Lindberg Construction Company has been doing general contracting work such as concrete work, sewer and water work, the laying of pavement, sidewalks, curbs and gutters. The Lindberg Construction Company does ninety per cent of its work with the state and its political subdivisions. At the time of the trial of this action in district court the plaintiff had been nominated as a representative of the 23rd Legislative District, Stutsman County, North Dakota. I take judicial notice of the fact that since said time the plaintiff has been elected to the House of Representatives of the State of North Dakota and is now serving as a Representative from the 23rd Legislative District of the State of North Dakota. The plaintiff has been in the contracting business for twenty years. Most, if not all, of the work in which the Lindberg Construction Company is engaged, is obtained on the basis of competitive bidding.

The facts further show that several members of the legislature are similarly situated as Mr. Lindberg and are and will be affected by the initiated measure approved by the people of the State of North Dakota at its primary election of 1954. The majority opinion sets forth the statute as adopted.

The defendant, S. W. Thompson, as Highway Commissioner of the State of North Dakota, testified that on the day of the trial of this action in the district court of Burleigh County, North Dakota, October 15, 1954, the Highway Department let

a contract for $12,300 for a culvert just east of Valley City, North Dakota. The plaintiff, under the terms of the initiated act, was ineligible to compete for said project as a prospective member of the House of Representatives unless he did one of two things, resigned his nomination for Representative of the 23rd Legislative District, or made himself and his corporation subject to the penalties of the act.

The defendant Thompson testified that bids submitted by the plaintiff and other contractors similarly situated had saved the state of North Dakota thousands of dollars. This evidence was not disputed. Competitive bidding by North Dakota resident contractors who are legislators has been beneficial rather than harmful.

The answer in intervention makes some rather extravagant statements as to fraud and the extraction of money from the State Treasury for political gain by state officials. However, there is not a scintilla of evidence to support any of the allegations of fraud and corruption.

The measure involved in this action was known as the "Anti-Corruption Measure." No corruption was shown to exist, or was brought to the attention of the trial court if it did exist, nor was any fraud or corruption shown to exist at the time that the measure was under consideration prior to its adoption. The publicity pamphlet, with reference to this measure says:

"However, there is at the present time no state law prohibiting members of the State Legislature from serving on a legislative appropriation committee and also receiving million dollar contracts from the State of North Dakota.

"It is time that this *unhealthy* situation be corrected so that there will be less chance for corruption and graft in state government." (Emphasis supplied.)

No unhealthy situation was shown to exist. Any evil at which this measure is aimed is based upon assumptions and not upon evidence.

No measure has been found or pointed out by the parties to this action that is approximately similar to the one involved here.

The facts stated will be of assistance in determining whether the initiated measure sets up a classification among the legislators of this state that is repugnant to, and in violation of, Section 11 of the Constitution of the State of North Dakota, which provides:

"All laws of a general nature shall have a uniform operation", and also whether it is violative of, and repugnant to, Section 20 of the North Dakota Constitution:

"No special privileges or immunities shall ever be granted which may not be altered, revoked or repealed by the legislative assembly; *nor shall any citizen or class of citizens* be granted privileges or immunities which upon the same terms shall not be granted to all citizens" (emphasis supplied);

and also whether this statute contravenes Section 1, Article 14 of the Constitution of the United States, which in part provides:

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The standard of uniformity required by Section 1 of the 14th Amendment of the United States Constitution is essentially the same as the standard of equality required by Sections 11 and 20 of the Constitution of the State of North Dakota. See Northwestern Improvement Co. v. Morton County, 78 N.D. 29, 47 N.W.2d 543.

These provisions of the state and federal constitution are limitations upon the legislature or upon the people acting by and through the initiative process. They were adopted to protect the people of this state

against discriminatory legislation. It is important that there be no encroachments upon these limitations.

The statute classifies members of the legislative assembly of the State of North Dakota into two classes; first, those that do business with the State of North Dakota or its political subdivisions in any calendar year for a consideration not in excess of $10,000. Such legislators are not subject to the penalties of the act; second, legislators who do business with the State of North Dakota or its political subdivisions for a consideration in excess of $10,000 during any calendar year. They become subject to the penalties of the act if they serve as members of the legislature and do business with the state or its political subdivisions while they hold their office as such. All legislators are not treated alike. The plaintiff and others similarly situated can do no business with the state or its political subdivisions because of the nature and the type of their business. Their particular endeavor is such that the contracts they might possibly acquire by competitive bidding are all beyond the $10,000 limitation involved in the initiated act.

In dealing with this statute it should be clearly understood that a legislator is not in any direct fiduciary relationship to the state or its political subdivisions. He has no power to enter into any contracts as such. His relationship, if any, is so extremely remote that it is difficult to conceive how his position as a legislator has any possible bearing on his business connections with the state as a contractor or supplier. He obtains his contracts in the field of competititve bidding on the same basis as all other citizens. This is pointed out in the case of Norbeck & Nicholson Co. v. State, 32 S.D. 189, 142 N.W. 847, in the special concurring opinion of P. J. Whiting.

The South Dakota constitutional provision will be set forth later. It is all inclusive and bars all members of the legislature from being interested directly or indirectly in any contract with the state or any county thereof during the term for which he was elected and for one year thereafter. This constitutional provision is not as sweeping as this initiated act, as it does not deal with all political subdivisions. All those within its provisions are treated alike. It is apparent from a comparison of the North Dakota Constitution and the South Dakota Constitution, both of which were under consideration at approximately the same time, that in North Dakota Section 43 of our constitution was adopted to cover the situation that the framers of the South Dakota Constitution had in mind by barring legislators from directly or indirectly contracting with the state or county during membership thereof and for one year thereafter. Our constitution has no such provision. Section 43 of our constitution requires a legislator to disclose a private or personal interest in a measure pending before the legislative assembly and he may not vote thereon without the consent of the house of which he is a member. It would seem logical to suppose that a legislator was not deemed to have any direct or indirect interest in an appropriation merely because on a competitive basis such legislator might receive a part thereof in payment of a contract that he obtained as the lowest and best bidder for the work or services involved.

The fundamental premise upon which the majority opinion is based is that the initiated act does not in fact make any classification; that the class is a single, undivided class; that it consists of the members of the legislature; or that in any event it does not discriminate between the large and the small in violation of either the 14th Amendment to the Constitution of the United States or Section 11 of the Constitution of the State of North Dakota, and that such classification bears a reasonable relationship to the public welfare, and is therefore, not in violation of the provisions of Section 11 of the North Dakota Constitution, and the 14th Amendment of the United States Constitution.

There is no question of the power of the legislature or the people by use of the initiative to impose restrictions upon a lawful calling, and the holding of legisla-

tive office is such a calling. Such restrictions must be exercised in conformity with the constitutional requirement that they operate uniformly and equally upon all persons pursuing the same business under the same circumstances. The constitutionality of a statute cannot be sustained if it selects particular individuals from a class or a locality and subjects them to peculiar rules or imposes upon them special obligations or burdens from which others in the same class are exempt. Hence, if a statute allows one class of persons to engage in a legitimate business, while denying such right to others, it must be based upon principles that must reasonably promote the public welfare. It is entirely clear that neither the legislature nor the people of the State of North Dakota, acting through the legislature or by the initiative process, do not possess the power to legislate without limit. All legislative acts must come within constitutional limits. Court decisions without number indicate that the judicial branch of the government continually declare statutes invalid that go beyond the scope of the legislative power.

"A proper classification must embrace all who naturally belong to the class, all who possess a common disability, attribute or qualification, and there must be *some natural and substantial difference germane to the subject and purposes of the legislation between those within the class included and those whom it leaves untouched.*" (Emphasis supplied.) Fountain Park Co. v. Hensler, 199 Ind. 95, 155 N.E. 465, 467, 50 A.L.R. 1518.

In this same case it was said:

"The question of classification is primarily for the Legislature and does not become a judicial question unless it clearly appears that the legislative classification is not based on substantial distinctions with reference to the subject-matter, or is manifestly unjust or unreasonable. Denny v. [City of] Muncie, 197 Ind. 28, 149 N.E. 639; Koplovitz v. Jensen, 197 Ind. 475, 151 N.E. 390 [25 N.C.C.A. 605]; Maercker v.

[City of] Milwaukee, 151 Wis. 324, 139 N.W. 199, L.R.A.1915F, 1196, Ann. Cas.1914B, 199."

In that same case the court, in dealing with classification, said:

"The Legislature cannot take what might be termed a natural class of persons, split that class in *two*, and then arbitrarily designate the dissevered factions of the original unit as *two* classes, and thereupon enact different rules for the government of each. State v. Julow, 129 Mo. 163, 31 S.W. 781, 29 L.R.A. 257, 50 Am.St.Rep. 443; State v. Miksicek, 225 Mo. 561, 125 S.W. 507, 135 Am.St.Rep. 597." (Emphasis supplied.)

In the case at bar, the initiated act takes a natural class, to wit, the members of the legislature, and divides it into two and then designates that those who do business with the state or its political subdivisions not in excess of $10,000 a year are not subject to the penalties of the act, while those that do business with the state or political subdivisions in excess thereof, are subject to the penalties of the act unless they decide to forego legislative office. It, therefore, becomes important in dealing with this statute to ascertain whether this classification is arbitrary, discriminatory, unreasonable and unnatural.

The Supreme Court of the State of North Dakota has heretofore had occasion in several decisions to set forth the general rules with reference to legislative classification. The early case of Vermont Loan and Trust Company v. Whithed, 2 N.D. 82, 49 N.W. 318, 320, sums up the situation as follows:

"A 'general law,' as the term is used in this constitutional provision, is a public law of universal interest to the people of the state, and embracing within its provisions all the citizens of the state, or all of a certain class or certain classes of citizens. It must relate to persons and things as a class, and not to particular persons or things of a class. It must *embrace the whole subject, or*

*a whole class,* \* \* \*." (Emphasis supplied.).

The case further lays down the following general principles that govern classification: A statute, in order to be of uniform operation need not be of universal operation. A general law may be constitutional and yet operate on a limited number of persons or things or within a limited territory. But insofar as it operates the benefits and the burdens must bear alike upon all persons and things upon which it operates. It must contain no provision that would exclude or impede its uniform operation upon all citizens or subjects and places within the state, provided, of course, that they are brought within the relations and circumstances specified by the act. Classification must be based on some differences in situation, constitution or purposes between the persons or things included in the class and those excluded therefrom as fairly and naturally suggest the propriety of and necessity for different or exclusive legislation in the line of the statute in which the classification appears. These general principles have been recognized by this court in other cases.

In the case of Edmonds v. Herbrandson, 2 N.D. 270, 50 N.W. 970, 971, 14 L.R.A. 725, the court, in commenting upon the dividing line between classification which is constitutional and that which is not, says:

"Where shall the line properly be traced? We believe that in testing this question these inquiries should be made: Would it be unjust to include the classes of objects or persons excluded? Would it be unnatural? Would such legislation be appropriate to them? Could it properly be made applicable? Is there any reasonable ground for excluding them?"

See also Beleal v. Northern Pac. Ry. Co., 15 N.D. 318, 108 N.W. 33; Gulf, C. & S. F. R. Co., v. Ellis, 165 U.S. 150, 155, 17 S.Ct. 255, 41 L.Ed. 666, 668; Powers Elevator Co. v. Pottner, 16 N.D. 359, 113 N.W. 703.

In one of the recent cases on this point, Herr v. Rudolf, 75 N.D. 91, 25 N.W.2d 916, 920, 169 A.L.R. 1388, the court, after reviewing decisions on the subject of classification stated:

"Summed up, these cases hold that where a statute creates a classification of citizens to be differently affected by the same general rule the classification must be natural and not artificial, reasonable and not arbitrary or capricious and 'must rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed.' "

" 'It is not the form a statute is made to assume, but its operation and effect, which is to determine its constitutionality.' " Angell v. Cass County, 11 N.D. 265, 270, 91 N.W. 72, 73.

With these general principles in mind, let us attempt by an analysis of the initiated act to ascertain how it will operate.

1. It is reasonable to state that in practical effect it will discourage, it may even prevent, a person who does more than $10,000 worth of business with the state or its political subdivisions in any calendar year from seeking legislative office.

2. It is unreasonable to suppose that a person situated as the plaintiff, whose corporation is doing ninety per cent of work for the state and its political subdivisions, will seek and remain in legislative office and expose himself and his corporation to the penalties of the act.

3. If to serve in the legislature a person comes within the terms of the act, transfers his interest in a partnership, corporation, or association of which he is a member to his or her spouse, he is still within the terms of the act. While the spouse question is not before the court in this action, it does have a bearing on whether the classification is within constitutional limits. It seems farfetched that a legislator may be subject to the act because his or her spouse owns five per cent of the assets of a business organization doing business within the terms of the act.

4. If a legislator owns five per cent or more of the assets of either a partnership,

corporation, or association, he is within the terms of the act.

One illustration of the inequites of this act and the discriminatory nature thereof is well illustrated by the fact that one legislator may own a two per cent interest in a partnership, association, or corporation with $5,000,000 worth of assets, or an interest of $100,000. If he is successful as a candidate for the legislature, he may serve in that capacity without being subject to the penalties of the act. The partnership, association, or corporation of which he is a member may continue to do business with the state or its political subdivisions. If another legislator has a six per cent interest in a corporation, partnership, or association whose total assets amount to $100,000, or an interest of $6,000, he must decide whether he wants to serve as a legislator and be subject to the penalties of the act, or decline to serve as such, so that his corporation, partnership, or association may continue to do business with the state or its political subdivisions. It is obvious that a large corporation, partnership or association, if successful in obtaining contracts from the state or political subdivisions, will do much more business within the scope of the act than a smaller business concern. Can it be said that such a law operates uniformly upon those within the class? Can it be said that it is not vulnerable to the constitutional inhibitions of lack of uniformity; special privileges and immunities and equality within the constitutional sections mentioned?

5. The arbitrary and discriminatory character of the act is further emphasized by the fact that it is possible for a person to be a member of the legislature and do business with the state or any of its political subdivisions in any one calendar year for a consideration amounting up to $9,999. He is not subject to the penalties of the act. He can retain his legislative office. Another legislator, such as the plaintiff, whose business is such that he either can do no business with the state or its political subdivisions, or the business will be in excess of $10,000, must determine whether he wants to serve in the legislature and suffer the penalties of

the act or forego doing business with the state or its political subdivisions. It is inconceivable why it should be legal for a member of the legislature to do business with the state or any of its political subdivisions up to $10,000 and still serve in his official capacity, while another individual, also in the same office, who does $10,001 worth of business for the state or its political subdivisions in any one year, must determine whether he should serve and forego doing business with the state or its political subdivisions, or decline to serve and continue to do business. This shows the unfairness and the impossibility of using a sum of money as the necessary measuring stick to determine the amount of corruption, the evil that this act is supplied to cure.

6. To further show the arbitrary and unnatural basis of classification here involved, the $10,000 limitation of the value of work, labor, services, materials, supplies or merchandise which a member of the legislative assembly may furnish to the state or its political subdivisions under the provisions of the measure is in the aggregate limit that may be furnished to any one political entity, and not the aggregate limit for all such entities. Under this interpretation, and it is correct, it is possible that a legislator dealing with political subdivisions of the state, may be successful, on a competitive basis, in procuring several contracts amounting up to $10,000, the total of which would amount to in the aggregate several times the minimum of $10,000. He could still serve in the legislature. He would not be subject to the penalties of the act. While another legislator, such as the plaintiff, who, because of the nature of his business cannot contract under the $10,000 limit, if successful in obtaining a contract with the state or any political subdivision in an aggregate amount of another legislator dealing with the several subdivisions under the limit, would have to forego doing business if he wished to retain his office as a legislator. If the act in question is susceptible of this interpretation, and it is, the question presented is, where is the natural basis for classification?

7. Under the facts in this case, the plaintiff only owns twenty per cent of the stock of the Lindberg Construction Company. His brothers and sisters own eighty per cent thereof. If the present plaintiff continues as a legislator, although owning only twenty per cent of the assets of the corporation, the corporation must forego all business with the state or its subdivisions during the incumbency of the plaintiff as a legislator. Eighty per cent of the owners of the stock of this corporation must forego doing all business with the state or its subdivisions during the entire period of legislative service of the plaintiff, unless the corporation also wants to be subject to the penalties of the act.

8. Furthermore this act in many instances will encroach upon the franchise of the electors of the state. If they elect an individual who comes within the terms of this law, and because of the nature of his business or his business connections, is unwilling to forego the sacrifices involved in refraining from doing business with the state or its subdivisions, and fails or refuses to qualify for the office to which he has been elected, which would be either as representative or senator, the electors of the district would be deprived of their choice of legislator. They would, therefore, have to make a second choice.

9. It will be noted that the initiated act uses the word "consideration". The word "profit" does not appear in the act. There is no necessary relationship between consideration and profit. If the purpose of the act is to remove temptation and use of undue influence in the procurement of business, then it would appear that the profit motive is the all-powerful incentive which would be productive of undue influence, fraud, or corruption. There may be more profit in a small contract than a large one, depending upon the keenness of the competitive bidding. This merely points out another unrealistic and improper basis for classification.

Aside from the possible discouragement to seek legislative office by all who come within the terms of the initiated act, there is nothing to hinder any citizen or any elector of the state from seeking legislative office. It is assumed that it is desirable in a representative republican form of government to enable all people to participate in the legislative functions of that government. It must be remembered that the establishment of the American government following the Revolution, right down to the present day, the people of this state and every state of the union, have been jealous of their political rights and the right to participate in the offices of the government and in the management of its public affairs. This has been considered one of the greatest privileges of American citizenship. The constitutional convention sought to perpetuate this principle in the Constitution of the United States. The Constitution of the State of North Dakota also sought to perpetuate this principle. The only qualifications for legislative office are set forth in two sections of our constitution:

> "No person shall be a representative who is not a qualified elector in the district from which he may be chosen, and who shall not have attained the age of twenty-one years, and have been a resident of the state or territory for two years next preceding his election." Section 34, North Dakota Constitution.

> "No person shall be a senator who is not a qualified elector in the district in which he may be chosen, and who shall not have attained the age of twenty-five years, and have been a resident of the state or territory for two years next preceding his election." Section 28, North Dakota Constitution.

While the initiated act is not a direct addition to the qualifications for the office of a legislator, it cannot be denied that many who would otherwise seek the office will eliminate themselves therefrom to escape the effect of the act to enable them to do business with the state without being subject to its conditions and penalties.

Any law which will have the effect of discouraging or making public office less

attractive to the people of the State of North Dakota should be scrutinized with care to determine whether it comes within the inhibitions placed upon the legislative branch by the Constitution of the United States and the State of North Dakota. The law in question will undoubtedly have the tendency to discourage those that do legitimate business with the state or its political subdivisions from seeking legislative office and placing themselves in a position to be subject to the penalties of the act.

To further ascertain the scope of this act, let us attempt to determine to whom it may be applicable. It is certain that it will affect a great many people. It does not only affect the plaintiff and those involved in contracting of a similar nature as the corporation in which he is interested. It affects insofar as ascertainable, the following categories of business:

1. All contractors engaged in furnishing heating, plumbing, and electrical equipment for any public building or buildings.

2. All engaged in the field of selling and furnishing office supplies to state or political subdivisions.

3. All suppliers of school equipment of every kind and nature.

4. All newspaper publishers and printers who deal with the state or any of its political subdivisions.

5. Large commercial printers who print ballots and other supplies of that character for the state or its political subdivisions.

6. Dealers in heavy road construction equipment, road maintenance equipment and snow removal equipment.

7. Dealers in automobiles, trucks, parts and accessories.

8. Dealers in steel, manufacture of culverts and materials of that type, such as steel culverts.

9. Fuel dealers who supply the state, county and other political subdivisions with fuel for public buildings and public institutions.

10. Gasoline dealers who sell oil and other automotive fuels for highway use to the state and its political subdivisions.

11. Food suppliers for penal, charitable and educational institutions of the state and its political subdivisions.

12. Furniture dealers who sell bedding, furniture and other supplies to the state for furnishing and equipping penal and educational institutions of the state or its political subdivisions.

In fact the category of persons or types of businesses that may be affected by this law is almost, if not entirely the same as the scope of the activities of most types of businesses in the state. There may be other types of businesses that may be affected, but the foregoing shows the potentialities of the act to affect those engaged in them or owning five per cent or more of the assets of a partnership, corporation or association, and who, if they come within the scope of the act and do business over and beyond the $10,000 limitation, must determine whether they will seek legislative office, or refrain from doing so, and continue their business operations without being touched by the act.

The question for judicial inquiry in this case is not the expediency or wisdom of the law, but whether there is discrimination within its terms which is so lacking in any reasonable basis in relation to the advancement of the public welfare as to make it arbitrary. Its scope and the effect that it may have upon the state and its people, however, has a bearing upon and does relate to the inquiry of whether it has a reasonable basis in relation to the advancement of the public welfare as to make it arbitrary. It is certain that any law as sweeping in its effect as this one, has and is bound to affect the public welfare.

The majority opinion says: "If the setting of this limit at $10,000 would render the measure unconstitutional simply because the type of business some legislators

conduct is generally within that limit and that of other legislators is generally beyond it, it would be impossible to find a limit which would be constitutional." Any such arbitrary classification will make any law that attempts to divide one class into two by such a dividing line alone, unconstitutional. If it is in the interest of the public welfare or the advancement thereof that a member of the legislature be deprived of contracting or doing business with the state or its political subdivisions within the scope of the act during the incumbency in such office, and if there is an evil that should be abated, or if there is any danger of corruption arising from the relationship of a legislator to the state and its political subdivisions in the procurement of contracts, which for the most part, if not entirely, are let on a competitive basis, then is there any reason why the evil or the tendency towards corruption should not be eliminated in the smaller transactions as well as the larger ones? There is no evil shown in this case. No corruption has been disclosed. Hence the rule announced in the case of Heath & Milligan Mfg. Co. v. Worst, 207 U.S. 338, 355, 356, 28 S.Ct. 114, 52 L.Ed. 236, 244, to the effect that legislation which regulates business may well make distinctions depend upon the degree of evil, is not applicable. It is assumed in the majority opinion that degrees of evil are dependent upon the amount of business done with the state or its political subdivisions in any one year. But as has been demonstrated, the act does not, in fact, make any distinctions between degrees of evil, for the reason that some legislators may do business with as many political subdivisions as possible, and in the aggregate obtain as much public business, which, when obtained under one contract from the state, or from one political subdivision, is in violation of the act by other legislators.

It is stated in the case of Engel v. O'Malley, 219 U.S. 128, 138, 31 S.Ct. 190, 193, 55 L.Ed. 128, 136:

"It is true, no doubt, that where size is not an index to an *admitted* evil, the law cannot discriminate be-tween the great and small." (Emphasis supplied.)

It will be noted that this reference is to an admitted evil. If it is assumed that an evil existed prior to the effective date of the initiated act, still the rule is applicable that the law cannot discriminate between the great and the small.

Fraud, corruption, evil cannot be measured in dollars and cents. If it is evil, or if there is any need to remove legislators from "temptation to venality" in the exercise of their legislative functions, it certainly is not dependent on the size or the amount of the business that they may lawfully do with the state or its political subdivisions without being subject to the penalties of the act. It is essentially as wrong for a legislator to obtain by undue influence a contract from the state or its political subdivisions involving a consideration of $10,000, as is involved in the procurement of a contract for $100,000 or $500,000 or any larger amount. If in the procurement of the contract or contracts the legislator uses the influence of his office, the evil in the use of such influence is not measurable by a dividing line between business done with the state or its political subdivisions under $10,000 or over $10,000. If it is necessary to eliminate any temptation in that connection in the exercise of legislative functions of the members of the legislature of this state, then each and all of them should be in exactly the same status. They should be prohibited from doing business directly or indirectly with the state or its political subdivisions.

Several statutes have been enacted in the past by the legislature of this state aimed at eliminating possible fraud or corruption which might arise by allowing members of various boards and commissions from doing business with themselves. See Sections 11-0947, 12-1006, 12-4607, 15-4902, 25-0113, 40-0809, 40-1305, 40-1306, 40-4910, 58-0512 and 61-0623, NDRC 1943. These statutes all deal with persons, officials, or agents of the state who are in a direct fiduciary relationship with the political entities, boards or commissions in-

volved. Generally speaking they prohibit all within their scope from becoming interested directly or indirectly in any contract or business conducted by them as such officials or agents. The measure involved in the case at bar is different from every other statute in our code dealing with matters aimed at possible fraud or corruption. All of the members within the statutes are included, none are excluded. There is no dividing line. No statute exists in our code that allows certain members of a board or other agency of the state or political subdivision to do a limited amount of business with such political entity, board or commission.

A diligent search fails to disclose any statute similar to the one involved in this litigation. It is true that many states have constitutional or legislative provisions which deal with a similar subject matter. They are cited in the majority opinion. But none have been found which divide a class and says in effect, some of this class of persons mentioned may do a limited amount of business with the state not in excess of $10,000 per year and be free from the penalties of the act, while those who do business beyond that limit, however small, are subject to its penalties unless they determine that they do not want to qualify for an office in the legislature of this state. If it is in the interest of the people or in the interest of the public welfare to exclude legislators from doing business with the state or its political subdivisions, the exclusion should be total.

Section 11 of Chapter 121 of the Revised Code of Maine, 1903, prevents an officer, and it is all inclusive, from being pecuniarily interested directly or indirectly in any contract made on behalf of the state or in an institution in which he holds a place of trust, and the contract is held void and also provides punishment for violation thereof. There are no exceptions. The statute in effect is much similar to some of the statutes already mentioned.

Article V, Section 30 of the Constitution of Montana provides, insofar as applicable:

"No member or officer of any department of the government shall be in any way interested in any such contract; and all such contracts shall be subject to the approval of the governor and state treasurer."

Article III, Section 12 of the Constitution of the State of South Dakota provides:

" * * * nor shall any member of the legislature during the term for which he shall have been elected, or within one year thereafter, be interested, directly or indirectly, in any contract with the state or any county thereof, *authorized by any law passed during the term* for which he shall have been elected." (Emphasis supplied.)

Section 365 of the Revised Statutes of Idaho, 1887, provides:

"Members of the Legislature, Territorial county, city, district and precinct officers, must not be interested in any contract made by them in their official capacity, or by any body or board of which they are members."

Article III, Section 16 of the Constitution of Nebraska provides:

" * * * nor shall any member of the Legislature, or any state officer be interested, either directly or indirectly in any contract, with the state or any county or municipality thereof, *authorized by any law enacted during the term* for which he shall have been elected or appointed, or within one year after the expiration of such term." (Emphasis supplied.)

Article IV, Section 15 of the Constitution of Illinois is almost identical with the one quoted from the South Dakota Constitution and the Nebraska Constitution:

" * * * nor shall any member of the general assembly be interested, either directly or indirectly, in any contract with the state, or any county thereof, *authorized by any law passed*

*during the term* for which he shall have been elected, or within one year after the expiration thereof." (Emphasis supplied.)

The South Dakota, Nebraska and Illinois constitutional provisions are entirely different than our initiated act.

It is significant that a most careful search has failed to disclose either a statute or a constitutional provision which has any similarity to the one now under consideration. All of our state statutes and all of the statutes and constitutional provisions of other states above set forth are all inclusive. They include the whole class. They make no distinctions between members of the class.

The initiated act is unconstitutional under Sections 11 and 20 of the Constitution of the State of North Dakota. It is not of uniform operation. It grants special privileges and immunities to some citizens which upon the same terms are not granted to all citizens within the class and it denies them equal protection of the laws, and it grants special privileges and immunities within Article XIV, Section 1 of the United States Constitution.

It is contended that no individual has a legal right to be selected as a contractor for the state or any of its political subdivisions and that a statute barring a class of individuals from opportunity to contract with the state bears some relation to the public welfare and is not violative of the due process, of the equal protection clause of the 14th Amendment to the Constitution of the United States and like provisions of the constitution of this state. The following cases are cited by the majority opinion in support of this rule of law. Perkins v. Lukens Steel Co., 310 U.S. 113, 127, 60 S.Ct. 869, 84 L.Ed. 1108, 1114; Atkin v. Kansas, 191 U.S. 207, 24 S.Ct. 124, 48 L.Ed. 148, 158; Tribune Printing & Binding Co. v. Barnes, 7 N.D. 591, 597, 75 N.W. 904; Ellis v. United States, 206 U.S. 246, 27 S.Ct. 600, 51 L.Ed. 1047; Heim v. McCall, 239 U.S. 175, 36 S.Ct. 78, 60 L.Ed. 206; People v. Crane, 214 N.Y. 154, 108 N.E. 427, L.R.A.1916D, 550, affirmed Crane v. People of State of New York, 239 U.S. 195, 36 S.Ct. 85, 60 L.Ed. 218; In re Opinion of the Justices, 303 Mass. 631, 22 N.E.2d 49, 123 A.L.R. 199. All these cases can be differentiated from the situations that do and will prevail under the initiated act.

The principle of the above cited cases is not applicable here. The act here involved was aimed at eliminating an evil, either assumed or real. A careful study of all of the cases cited discloses that they deal with the entire class and no attempt is made to differentiate within the class. The statutes involved in these cases operated upon all alike. If it is necessary to eliminate legislators because of possible influence which they may have in procuring contracts from the state or its political subdivisions because they set the mill levies for the political subdivisions and vote upon appropriations for the various departments of the state, these cases do not furnish authority for the proposition that the state may play favorites with some of the people within the class.

"Undoubtedly the General Court (the Legislative Assembly of Massachusetts) under the Constitution has broader power to deal as employer with employees than to regulate the conduct of the general public. *But it does not follow that there are no constitutional limitations upon the power of the General Court as employer. The General Court does not in all particulars have the same freedom of action as a private employer with respect to the employment of citizens.*" In re Opinion of the Justices, 303 Mass. 631, 22 N.E.2d 49, 57, 123 A.L.R. 199. (Emphasis supplied.)

Here the state as an employer, if it deems it necessary in the interest of the public welfare, must exclude all members of the legislative assembly from having any possible interest in its public expenditures. If the public interest requires this exclusion there is no justification that some are allowed to do a limited amount of business with the state or its political subdivisions,

while others, because of the peculiar nature of their business cannot do any business with the state or its political subdivisions.

"Since government, in expending public moneys, is expending the moneys of its citizens, it may not, by arbitrary discriminations having no relations to the public welfare, foster the employment of one class of its citizens and discourage the employment of others. It is not fettered, of course, by any rule of absolute equality; the public welfare may at times be bound up with the welfare of a class; but public welfare, in a large sense, must, none the less, be the end in view. Every citizen has a like interest in the application of the public wealth to the common good, and the like right to demand that there be nothing of partiality, nothing of merely selfish favoritism, in the administration of the trust."

Thus spoke Judge Cardozo, later Judge of the United States Supreme Court, in the case of People v. Crane, 214 N.Y. 154, 108 N.E. 427, 429, L.R.A.1916D, 550, affirmed Crane v. People of State of New York, 239 U.S. 195, 36 S.Ct. 85, 60 L.Ed. 218.

The case of Perkins v. Lukens Steel Co., 310 U.S. 113, 116, 117, 60 S.Ct. 869, 872, 84 L.Ed. 1108, 1109, dealt with the Public Contractors Act of June 30, 1936. By virtue of that act, sellers were required to agree to pay employees engaged in producing goods so purchased " 'not less than the minimum wages as determined by the Secretary of Labor to be the prevailing minimum wages for persons employed on similar work or in the particular or similar industries or groups of industries currently operating in the locality in which the * * * supplies * * * are to be manufactured or furnished under said contract.' " 41 U.S.C.A. § 35. The main point of decision was the correctness of the construction placed by the Secretary of Labor upon the term "locality" as used in the provisions of the Public Contractors Act. The case determined that the government, like private individuals, enjoyed the unrestricted power to determine with whom it would deal and to fix the terms and conditions upon which it would make the needed purchases. However, the class of people or things covered by the act were treated alike on the basis of "locality" as determined by the Secretary of Labor. There was no division of the class. The statute involved in that case provides that contracts for materials, supplies and equipment exceeding $10,000 must contain certain stipulations regarding the labor employed on such contracts. This provision of the statute is not mentioned in the opinion and apparently was not raised, so the case cannot be considered as authority for the contention that the $10,000 limitation in the statute involved in the case at bar constitutes a proper basis for classification. There may have been additional reasons for that classification.

The case of Atkin v. Kansas, 191 U.S. 207, 24 S.Ct. 124, 48 L.Ed. 148, considered a Kansas statute prohibiting the employment of laborers for more than eight hours a day on any public work. The statute was held valid in its application to laborers in the service of contractors. Again it will be noted that the statute in question in that case dealt with the whole class. There is no division in the class itself, nor are any distinctions made. The class was all-inclusive.

The case of Ellis v. United States, 206 U.S. 246, 27 S.Ct. 600, 51 L.Ed. 1047, dealt with a statute passed by the Congress to regulate employment on public works in the District of Columbia. The presence of an independent contractor, interposed between the state and the laborer, was held not to check the power of the government to prescribe the hours of labor. Again it will be noted that the statute involved applied to all people alike within its terms equally.

The Tribune Printing & Binding Co. v. Barnes, 7 N.D. 591, 75 N.W. 904, involved a statute of this state providing that all county printing shall be done in the state, and if practical in the county ordering the same. It was held in that case that mandamus did not lie to compel the county commissioners to recognize and consider a bid

for county printing made by parties who would do the work of printing outside of the limits of the state if awarded the contract for which the bid was made. This classification was further held not to discriminate either against nonresidents or those whose places of business were situated in another state. The sole requirement of the statute was that the county printing be done within the state. The classification was solely for the advancement of the people within the state. It was germane to the public welfare.

The case of Heim v. McCall, 239 U.S. 175, 36 S.Ct. 78, 79, 60 L.Ed. 206, involved the application of a New York Statute against the employment of aliens on public works. The statute provided: " 'only citizens of the United States shall be employed' ". Laws 1909 N.Y. c. 36, § 14. The statute excluded the employment of all aliens. The class to which it was applicable was inclusive of all of those who came within that category.

The case of People v. Crane, 214 N.Y. 154, 108 N.E. 427, 428, L.R.A.1916D, 550, affirmed Crane v. People State of New York, 239 U.S. 195, 36 S.Ct. 85, 60 L.Ed. 218, involved the conviction of one Crane for employing aliens as laborers in the performance of a contract in the construction of a municipal sewer project in violation of Section 14 of a New York State statute providing for preference in the employment of persons upon public works, the statute providing: " 'and in all cases where laborers are employed on any such public works, preference shall be given citizens of the state of New York.' " Laws 1909 N.Y. c. 36, § 14. This statute was upheld on the theory that: "Whatever is a privilege, rather than a right, may be made dependent upon citizenship." This statute included all citizens and excluded aliens. This case cites both the Atkin v. Kansas and Ellis v. United States cases, supra.

In re Opinion of Justices, 303 Mass. 631, 22 N.E.2d 49, 61, 123 A.L.R. 199, dealt with several proposed statutes aimed at the exclusion of married women from public employment. In that case it is said:

"The proposed statute excluding married women from employment in the public service obviously would constitute unmarried women an absolutely preferred class with respect to all such employment of women as compared with married women as a class. Thus the matter has two aspects: (a) Whether unmarried women constitute a class of persons which on any reasonable ground in the interest of the public welfare can by statute be absolutely preferred to married women in selections for employment in the public service, and (b) whether married women constitute a class of persons which on any reasonable ground in the interest of the public welfare can by statute be absolutely excluded from such employment."

In summing up, the court says:

"We conclude, therefore, that House bills (mentioning several of the proposed legislative acts), if enacted, would be in violation of the Constitution of the Commonwealth because making arbitrary discriminations in the *selection* of persons for employment in the public service." (Emphasis supplied.)

That is the effect of the initiated act. It makes a selection within the terms of the act of those that are in a position to do business under $10,000. It excludes the plaintiff and others similarly situated unless they decide to give up the privilege of serving the state as legislators.

In re Opinion of the Justices, supra, does not go as far as the other cases cited in the majority opinion in supporting the proposition that the government, state or national, or the agencies thereof, have the power to determine with whom they will do business and to fix the terms and conditions thereof. That case indicates that the legislature does not in all particulars have the same freedom of action as the private em-

ployer with respect to the employment of citizens. At least to that extent it is not in complete harmony with the other cases cited.

The case of Shaw v. City Council of Marshalltown, 131 Iowa 128, 104 N.W. 1121, 1128, 10 L.R.A.,N.S., 825, is a mandamus action arising out of a refusal to recognize honorably discharged soldiers and sailors of the Civil War, residents of Iowa, under a statute passed by the general assembly in 1904, providing for right of preference in appointment, employment and promotions in the public service over other persons of equal qualifications. The case determined that the preference law was constitutional and that there was no class legislation involved. The court's determination is based upon much the same reasoning as is contained in the cases previously mentioned. It is interesting to note, however, that a strenuous dissent was filed by Judge Bishop and concurred in by Judge Weaver. Some of the reasoning of that dissent is applicable here. One of the underlying points upon which the dissenting opinion is based is that "a government having for its cardinal doctrine that as to everything having relationship to citizenship there shall be equal rights for all and special privileges to none."

The case of the City and County of Denver v. Bossie, 83 Colo. 329, 266 P. 214, with reference to the constitutional question involved follows the reasoning of Heim v. McCall, supra, Atkin v. Kansas, supra, and Tribune Printing & Binding Co. v. Barnes, supra, and in addition cites the case of Collins v. Senatobia Blank Book & Stationery Co., 115 Miss. 254, 76 So. 258, Ann.Cas.1918B, 953.

The rule announced in these cases does not, however, apply to the facts in the case at bar. These cases imposed conditions applicable to the entire class of persons mentioned in the statutes therein discussed. They differ so much on the facts from the case at bar that the rule of law announced in them does not give any assistance in the solution of the problem involved here. It may be conceded that the state may initiate and enact legislation, which, based upon proper classification and which comes within all of the general rules pertaining thereto as hereinbefore set forth, may exclude a class of persons from public employment, but if the state attempts to do so it may not discriminate or divide the class of persons so as to include some and exclude others. That has been done by the initiated act. The $10,000 figure is purely arbitrary; it is artificial; it constitutes an unnatural division. Why should there be any division on a monetary basis? Such division results in inequalities, unfairness, and subjects the act to the constitutional objections of inequality, lack of uniformity, and special privileges for some denied to others.

The analysis of the legal effect of the initiated act demonstrates conclusively that the classification therein contained is arbitrary, discriminatory, unreasonable, unnatural and artificial. The act is, therefore, unconstitutional and invalid and should be so declared.

I am authorized to state that Judge GRIMSON concurs in the views expressed in this dissenting opinion.